## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARK RHEAULT,             )
                                  )
      *Plaintiff*,        )
                                  )      Civil Action No. 23-700-WCB
      v.                   )
                                  )      **FILED UNDER SEAL**
HALMA HOLDINGS INC. and  )
CENTRAK, INC.,          )
                                  )
      *Defendants*.     )

## MEMORANDUM OPINION AND ORDER

Plaintiff Mark Rheault filed a complaint against defendants Halma Holdings Inc. and CenTrak, Inc., on June 27, 2023. The complaint alleged securities fraud by Halma (Count I), common law fraud by Halma (Count II), breach of contract by Halma (Count III), breach of the implied covenant of good faith and fair dealing by Halma (Count IV), a right to contractual indemnification from Halma (Count V), unjust enrichment by CenTrak (Count VI), civil conspiracy by Halma and CenTrak (Count VII), and a right to recover attorneys' fees from Halma (Count VIII) and CenTrak (Count IX).

The defendants filed a motion under Fed. R. Civ. P. 12(b)(6) to dismiss the complaint, Dkt. No. 12, and a brief in support of the motion, Dkt. No. 13. Mr. Rheault filed a response, Dkt. No. 18, and the defendants filed a reply, Dkt. No. 19. For the reasons set forth below, the defendants' motion is GRANTED IN PART and DENIED IN PART.

### I.    Background

Because the defendants have sought to have the claims dismissed for failure to state a claim upon which relief can be granted, the court is required to accept as true all the factual allegations

1

in the complaint and all reasonable inferences that can be drawn from those factual allegations after construing them in the light most favorable to the plaintiff. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). Accordingly, the facts set forth below are based on the allegations in Mr. Rheault's complaint, Dkt. No. 1.

This case arises out of Halma's acquisition of Mr. Rheault's company, Infinite Leap, Inc. Mr. Rheault founded Infinite Leap in 2011. *Id.* ¶ 1. Infinite Leap was a "full solution provider" in the healthcare industry, "complete with software, hardware, and design, installation, consulting, and support services," including Real-Time Location Systems, which identify the location of objects in real time. *Id.* ¶¶ 30, 68.

Halma is a public holding company incorporated in Delaware. *Id.* ¶¶ 22, 36. Halma acquired CenTrak in 2016. *Id.* ¶ 41. CenTrak is "primarily a hardware technology provider of Real-Time Location Systems." *Id.* ¶ 44. In 2019, Halma acquired Cetani, a company that developed and sold a Real Time Location Systems software platform called Activate. *Id.* ¶¶ 55, 59. As part of the Cetani acquisition, Halma agreed to pay the sellers of Cetani an earnout if Cetani's products achieved certain revenue benchmarks after the sale. *Id.* ¶ 142.

In the years following its inception, Infinite Leap made substantial sales in the healthcare industry and experienced a high growth rate. *Id.* ¶¶ 3–4. In 2021, Mr. Rheault received expressions of interest from several potential purchasers seeking to acquire Infinite Leap. *Id.* ¶ 5. He ultimately chose to sell Infinite Leap to Halma and its parent company, Halma plc. *Id.* The parties negotiated a stock purchase agreement ("the SPA") in which Halma agreed to pay $30 million for Mr. Rheault's shares of Infinite Leap on the closing date (November 18, 2021) and also agreed to pay Mr. Rheault an earnout of $17 million if the sales of Infinite Leap products met certain revenue

benchmarks within two years of the closing date. *Id*. ¶¶ 92–93, 111–113. Mr. Rheault alleges that if Infinite Leap's growth had continued at the same rate that it enjoyed prior to the acquisition, the company would have "easily achieved the full amount of the Earnout." *Id*. ¶ 6.

In the SPA, Halma agreed that it would not "directly or indirectly, take any action, or cause or permit any action to be done in bad faith with the principal purpose of avoiding or reducing the amount of any Earnout" to Mr. Rheault. *Id*. ¶ 107; *see also* Dkt. No. 1 Ex. A § 1.8(d). Halma also agreed that CenTrak would provide the funding for at least five full-time sales representatives during the earnout period who would be dedicated to selling Infinite Leap products and services. *Id*. ¶ 109; *see also* Dkt. No. 1 Ex. D, 1.8 § 5.

During the negotiation of the SPA, according to the complaint, Halma failed to disclose its obligations under the earnout agreement that Halma entered into in connection with the Cetani acquisition. *Id*. ¶ 7. Under the Cetani agreement, Halma agreed to sell and promote the Cetani software, which competed with Infinite Leap's software. *Id.* ¶¶ 148–149. Halma's agreement with Cetani was to run through March 31, 2022, which was halfway through the first year of Infinite Leap's earnout period under the SPA. Mr. Rheault did not learn about the Cetani earnout agreement until February 2022. *Id*. ¶ 146.

During the first few months after Halma acquired Infinite Leap, Halma conducted an in-depth hardware and software review and cross-training activities. *Id.* ¶ 122. Thereafter, Halma and CenTrak decided to integrate Infinite Leap's software into CenTrak's main software platform to avoid direct competition among CenTrak's various product lines. *Id.* ¶¶ 122–124. Mr. Rheault was originally supportive of that integration, "premised on CenTrak CEO Dave Minning's commitment to restructure his Earnout based on the integration." *Id.* ¶ 127. However, CenTrak ultimately chose not to restructure Mr. Rheault's earnout. *Id.* ¶ 128. As a result of the integration,

Mr. Rheault alleged, the sales generated from Infinite Leap's products and services were attributed to CenTrak, not to Infinite Leap.  *Id.* ¶ 306.

During the earnout period after the acquisition, according to Mr. Rheault, CenTrak failed to maintain five full-time sales representatives dedicated to selling Infinite Leap products and services, even though Mr. Rheault repeatedly voiced concern to CenTrak about the failure to hire the requisite number of salespeople and the assignment of Infinite Leap salespeople to non-Infinite Leap accounts.  *Id.* ¶¶ 156–196.  During the same period, Mr. Rheault alleges, Halma failed to launch "several key Infinite Leap products and services in a timely manner," including the following: "(1) Workflow software application; (2) Asset Management software application; (3) Moblee Real-Time Locating System; and (4) Engage professional services."  *Id.* ¶ 10.

## II.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed if it "fail[s] to state a claim upon which relief can be granted." The Third Circuit directs district courts to conduct a two-step analysis under Rule 12(b)(6).  First, the court must separate the factual and legal elements of a claim; the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). Second, the court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Claims under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78(b), and Securities and Exchange Commission rule 10b-5, 17 C.F.R. § 240.10b-5, are subject to the heightened pleading standards in the Private Securities Litigation Reform Act ("PSLRA").  To state a claim for securities fraud under section 10(b), "plaintiffs must allege (1) a material

4

misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014) (citations omitted).

Claims alleging fraud are subject to the pleading standard of Federal Rule of Civil Procedure 9(b). Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake." Under that standard, a plaintiff must plead "(1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) (quotation omitted).

### III. Discussion

The defendants have moved to dismiss each of the nine claims Mr. Rheault has brought against them.

#### A. Fraud (Counts I & II)

In the first two counts of his complaint, Mr. Rheault alleged fraud by Halma under section 10(b) of the Securities and Exchange Act and under Delaware common law. Halma argues that both counts must be dismissed for three reasons: (1) Halma was under no affirmative duty to disclose the facts that Mr. Cetani claims it concealed; (2) the "bootstrapping doctrine" under Delaware law bars a common law fraud claim that is duplicative of a related breach of contract claim; and (3) Mr. Rheault failed to allege securities fraud with the required particularity to state a claim under the heightened pleading standards for section 10(b) claims and failed to allege

common law fraud with the particularity required by Federal Rule of Civil Procedure 9(b).  Dkt. No. 13 at 5–11.

### 1.    The Duty to Disclose

The defendants argue that under both Delaware common law and section 10(b) a plaintiff can state a claim for fraud by nondisclosure of information only if the defendant had a duty to disclose that information in the first place, such as a duty stemming from a fiduciary relationship. Dkt. No. 13 at 5–6 (citing *Chiarella v. United States*, 445 U.S. 222, 228 (1980); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. 3658, 2009 WL 1124451, at *11 (Del. Ch. Apr. 20, 2009), and *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, No. 2129, 2007 WL 1498989, at *5 (May 16, Del. Ch. 2007)).  In their reply brief, the defendants further argue that the source of the duty to disclose must be other than the PSLRA itself.  Dkt. No. 19 at 1 (citing *Chiarella*, 445 U.S. at 228, and *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000)).

Mr. Rheault responds that his complaint sufficiently disclosed material information that Halma was under a statutory duty to disclose.  Dkt. No. 18 at 6–9 (citing 17 C.F.R. § 240.10b-5(b) and *Key Star Partners, LLC v. Insignia Disposal Servs., LLC*, No. CV 22-2338, 2023 WL 2920283 (E.D. Pa. Apr. 12, 2023)).  Halma's conflicting contract with another company was material to their agreement, Mr. Rheault argues, because it was "important in deciding how to act."  *Id.* at 8– 9 (quoting *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 413 (D. Del. 2009)).

Under the PSLRA, it is unlawful to "[make] a materially false or misleading statement or omit[] to state a material fact necessary to make a statement not misleading" in connection with the sale of a security.  *Oran*, 226 F.3d at 281.  "Generally, undisclosed information is considered material if 'there is a substantial likelihood that the disclosure would have been viewed by the

reasonable investor as having significantly altered the total mix of information available to that investor.'" *Id.* at 282 (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714 (3d Cir.1996)) (cleaned up).

Mr. Rheault alleged that Halma made material misrepresentations and omissions of material facts in the course of their negotiations by failing to disclose the existence of the Cetani earnout agreement, even though that agreement directly conflicted with the earnout provision in Mr. Rheault's agreement with Halma. Complaint ¶¶ 246–254. The allegation that the omission was material is plausible on the theory that the Cetani earnout agreement would have significantly altered the total mix of information available to Mr. Rheault in determining the value of Halma's offer to purchase Infinite Leap. However, Mr. Rheault has not shown that Halma had a statutory duty to disclose that information to him based solely on that non-disclosure. As the Third Circuit has explained, "non-disclosure of material information will not give rise to liability under Rule 10b–5 unless the defendant had an affirmative duty to disclose that information." *Oran*, 226 F.3d at 285.

While non-disclosure is not by itself sufficient to establish liability under the securities laws, the failure to make a disclosure of material information can be actionable if the disclosure is "necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *City of Edinburgh Council*, 754 F.3d at 174 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Mr. Rheault has pleaded that the Cetani earnout agreement conflicted with his own earnout agreement in the SPA, and that Halma's failure to disclose the Cetani earnout agreement when negotiating the acquisition of Infinite Leap shares from Mr. Rheault rendered Halma's representations about the Infinite Leap earnout provision misleading. Complaint ¶¶ 142–152, 246–253. Mr. Rheault has also alleged that because of the

7

conflict, Halma did not sell and promote Infinite Leap's software during the period of overlap between the two earnout agreements. *Id.* ¶ 150. Assuming those allegations to be true, Mr. Rheault's complaint sufficiently alleges that the Cetani earnout agreement was a material fact bearing on Halma's negotiation of Mr. Rheault's earnout agreement, and that Halma's non-disclosure was misleading in the context of other statements regarding the prospective earnout payment that were made during the negotiations for the sale of Infinite Leap.

For purposes of Mr. Rheault's common law fraud claim, Mr. Rheault's complaint also sufficiently pleaded that Halma had a duty to speak. *See* Complaint ¶¶ 262-269. In support of their contention that Mr. Rheault's allegations of fraud were insufficient, the defendants cite two cases, *Bay Center Apartments* and *MetCap*, which explain that to prove common law fraud through silence, the plaintiff must establish that the defendant had a duty to speak. *See Bay Center Apartments*, 2009 WL 1124451 at *11; *MetCap*, 2007 WL 1498989 at *5. The court in *Bay Center Apartments* found that the duty to speak arose from the defendants' fiduciary duty to the plaintiff. 2009 WL 1124451 at *11–12. The court in *MetCap* found that the plaintiff had not sufficiently pleaded fraud where the defendants did not inform the plaintiff of a change to a contract on which the plaintiff was a third-party beneficiary, because there was no fiduciary or contractual relationship between the parties generating a duty to speak. 2007 WL 1498989 at *5.

Neither of those cases suggests that only a fiduciary duty can give rise to the duty to speak, and neither case is similar to this one. In a more analogous case between two parties that entered a contract for acquisition, a District of Delaware court found that a plaintiff alleging the omission of material facts specifically for the purpose of inducing the plaintiff to enter a sales contract sufficiently pleaded common law fraud. *See Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 708–09 (D. Del. 2010). As in that case, Mr. Rheault alleged that Halma

8

made omissions of material fact relating to the earnout payment to induce Mr. Rheault to sell Infinite Leap on the conditions ultimately agreed to. According to Mr. Rheault's complaint, those omissions were made in the context of Halma's promises regarding the earnout payment, and those promises created a duty to disclose facts having a material effect on the value of Halma's purchase offer for Infinite Leap. Those allegations were sufficient to support Mr. Rheault's common law fraud claim against Halma. Accordingly, Counts I and II will not be dismissed on the basis of the defendants' theory that Halma had no duty to disclose its allegedly conflicting arrangement with Cetani.

### 2. Bootstrapping

The defendants next argue that Mr. Rheault has impermissibly sought to convert a claim of breach of contract into a claim of common law fraud and that his fraud claim must be dismissed as impermissibly duplicative under Delaware's "bootstrapping doctrine." Dkt. No. 13 at 6–7. In support, the defendants cite a Delaware Chancery Court opinion explaining that under Delaware law a complaint that "merely allege[s] that the parties had a contract and [the defendant] Onstream intended not to follow through with its obligations under the Agreement and nothing more" states only a claim for breach of contract and not a claim for fraud. *Black Horse Capital, LP v. Xstelos Holdings, Inc.*, No. CV.A. 8642, 2014 WL 5025926, at *25 (Del. Ch. Sept. 30, 2014).

Mr. Rheault answers that the bootstrapping doctrine does not apply because he sufficiently pleaded fraudulent inducement separately from his claim of breach of contract. Dkt. No. 18 at 11. For support, Mr. Rheault cites *Levy Family Investors, LLC v. Oars + Alps LLC*, which explained that the "bootstrapping" doctrine does not apply where "(1) the plaintiff alleges seller knowingly made false contractual representations, (2) damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim, (3) the conduct occurs prior to the execution of the

9

contract and thus with the goal of inducing plaintiff's signature and willingness to close on the transaction, or (4) the breach of contract claim is not well-pled such that there is no breach claim on which to 'bootstrap' the fraud claim." No. CV 2021-0129, 2022 WL 245543, at *8 (Del. Ch. Jan. 27, 2022).

I agree with Mr. Rheault. Mr. Rheault alleged that, prior to the closing date and in order to induce him to sign the SPA, Halma misrepresented the earnout provision by failing to disclose its obligations under its agreement with Cetani. Complaint ¶¶ 6–7, 259–269. Even though Mr. Rheault's fraud and breach claims overlap to some degree, the fraud claim is distinct from the breach claim, because Mr. Rheault sufficiently pleaded that Halma engaged in fraudulent inducement by making representations regarding the earnout proposal without disclosing material facts bearing on the value of that proposal. *See Levy Family Investors*, 2022 WL 245543 at *8.

*Black Horse Capital*, on which the defendants rely, does not dictate a different result; in that case, the court explained that the bootstrapping doctrine does not apply when the fraud complaint is directed to misrepresentations leading up to an agreement or when the allegations of fraud do not rely solely on the intent not to perform obligations imposed by an agreement. 2014 WL 5025926, at *25. Because Mr. Rheault has sufficiently pleaded pre-agreement misrepresentations and omissions intended to induce Mr. Rheault to enter into the SPA, the two fraud counts in the complaint will not be dismissed on the ground that they are duplicative of Mr. Rheault's breach of contract claim.

### 3. Heightened Pleading Standard

The defendants argue that Mr. Rheault failed to state a claim for section 10(b) fraud or common law fraud under the heightened pleading standards of the PSLRA and Federal Rule of Civil Procedure 9(b). Specifically, the defendants argue that Mr. Rheault failed to sufficiently

plead three elements of both causes of action: (1) material omission or misrepresentation; (2) scienter; and (3) reasonable reliance.  Dkt. No. 13 at 7–12.

### i.    Material Omission or Misrepresentation

The defendants first argue that this court should dismiss Mr. Rheault's two fraud claims because he failed to plead the facts relating to the claims with sufficient specificity.  Dkt. No. 13 at 11–12.  In particular, the defendants argue that Mr. Rheault failed to specify (1) where the alleged omission was made and how it occurred; (2) what, specifically, was misrepresented; and (3) when the omission and misrepresentation occurred, with more specificity than between August 5 and November 8, 2021, the dates set forth in the complaint.

Mr. Rheault responds that the allegations in his complaint were sufficient, and that this court should follow the analysis employed by the court in the analogous case of *Key Star Partners, LLC v. Insignia Disposal Services*, No. CV 22-2338, 2023 WL 2920283 (E.D. Pa. Apr. 12, 2023).  There, the court required prompt discovery rather than an amended complaint to flesh out the facts of a section 10(b) case.  *Id.* at *9.

It is not necessary to decide whether it would be appropriate in this case to go down the path followed by the court in *Key Star Partners*, because I find that Mr. Rheault has sufficiently alleged the circumstances surrounding the omission, including when and how it occurred.  Mr. Rheault alleged that "Between August 5, 2021, and November 8, 2021, key Halma and CenTrak management personnel made material misrepresentations and omissions to Rheault, including Halma's Divisional CEO and CenTrak's CEO."  Complaint ¶ 246.  That is the time period during which Mr. Rheault and Halma were negotiating Halma's acquisition of Infinite Leap.  Mr. Rheault alleged that Halma "materially omitted the existence of, and facts surrounding, the Cetani Earnout Agreement."  *Id.* ¶ 247.  Mr. Rheault also alleged that the Cetani earnout agreement was an

agreement to pay the Cetani sellers if certain gross margin benchmarks were met by March 31, 2022 (or halfway through the first year of Mr. Rheault's earnout period). *Id.* ¶¶ 142, 148.

The defendants cite three cases for the proposition that Mr. Rheault's complaint contains "the exact type of barebones allegations that fail the requisite heightened pleading standards and require dismissal." Dkt. No. 13 at 12. In the first case, *King v. Pratt & Whitney Canada Corp.*, the court found that a plaintiff who pleaded only that the defendant represented that its products were safe, when the defendant ought to have known that assertion was false, did not satisfy Rule 9(b)'s requirements because it was not clear what constituted the claimed misrepresentation and what was omitted. No. 20-359, 2021 WL 663059, at *4 (D. Del. Feb. 19, 2021). The complaint in that case failed to include any allegations as to where, when, and to whom the statements in question were made, and it failed to allege what made the statements false. *Id.* Mr. Rheault's claims are significantly more specific than those in *King.* He alleged with specificity what information was omitted and that the omissions occurred in the course of the SPA negotiations between August and November of 2021. He also alleged that what was misleading about the omissions was that the Cetani earnout agreement made it impossible for the sales of Infinite Leap products to reach the level required to trigger the earnout payment obligation that the parties considered part of the consideration for the purchase of Infinite Leap. *See* Complaint ¶ 262.

In the second case, *Cavi v. Evolving Systems NC, Inc.*, the court found that the defendant's counterclaims did not satisfy the pleading requirements of Rule 9(b) because although the defendant "identifie[d] specific calendar quarters" in which the false statements were made, the defendant did not provide the general content of the misrepresentations. No. 15-1211, 2018 WL 2372673, at *3 (D. Del. May 24, 2018). The defendant in *Cavi* alleged that the plaintiff submitted false commission statements, but did not include information about the content of those statements.

12

*Id.* Mr. Rheault's allegations contained considerably more specificity as to the details of what was omitted than was alleged in *Cavi*.

In the third case, *Southern Track & Pump, Inc. v. Terex Corp.*, the court found that the plaintiff did not plead fraud with sufficient particularity where the plaintiff "identifie[d] few, if any details, regarding the content, manner, and circumstances of the alleged fraud," including failing to "identify a single individual who was involved in the alleged fraud" and only identifying "broad  months-long time frames" in which the alleged misrepresentations occurred.  623 F. Supp. 2d 558, 567 (D. Del. 2009).  Unlike the plaintiff in *Terex Corp.*, Mr. Rheault identified at least two individuals who made the misrepresentations (the CEOs of Halma and CenTrak); he identified the circumstances of the fraud (the SPA negotiations); he identified the omissions (information about the Cetani earnout agreement); and he identified the time period during which the omissions were made (between August 5 and November 8, 2021).  Unlike an affirmative misrepresentation, an omission occurs over the entire period of time during which the party fails to make a disclosure he is under a duty to make.  The fact that Mr. Rheault has identified a period during which Halma failed to disclose the arrangement it was negotiating with Cetani therefore does not reflect a lack of specificity as to the time of that nondisclosure.

### ii.    Scienter

Under the PLSRA, courts considering a motion to dismiss must determine "'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'"  *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).  The defendants argue that the complaint fails to adequately plead scienter because the allegations directed to that issue are "wholly conclusory and nonspecific" and fail to

establish "*how* or *why* Halma intended to deceive, manipulate, or defraud Plaintiff." Dkt. No. 13 at 8.

Mr. Rheault responds that he sufficiently alleged that Halma had the "motive and opportunity" to commit fraud. Dkt. No. 18 at 6–7 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)). In the complaint, Mr. Rheault alleged that (1) Halma omitted information about the Cetani earnout agreement; (2) the Cetani earnout agreement directly conflicted with Halma's agreement with Mr. Rheault; (3) Halma was one of several potential purchasers of Infinite Leap; and (4) Halma saw many benefits to purchasing Infinite Leap— including that the acquisition would accelerate the development of CenTrak's programs. Complaint ¶¶ 84–88, 143, 248. Mr. Rheault argues that those allegations show that Halma was eager to acquire Infinite Leap and that it did not disclose the conflicting agreement with Cetani because of concern that disclosing the Cetani agreement could have made Halma's purchase offer less attractive than offers from other prospective buyers who had shown interest in acquiring Infinite Leap. Dkt. No. 18 at 6–7.

To determine whether pleaded facts give rise to a "strong inference of scienter," the Third Circuit directs courts to assess whether that inference is "at least as compelling as any opposing inference." *Winer Family Trust*, 503 F.3d at 327. The defendants do not propose any alternative inferences, but focus instead on the lack of particularity of Mr. Rheault's allegations. Nonetheless, this court still must consider other plausible inferences that can be drawn from the pleaded facts. *Id.* For example, it is plausible from the facts alleged that Halma may have believed it could achieve the benchmarks necessary for both the Cetani earnout agreement and the Infinite Leap earnout agreement. Because Mr. Rheault alleged that the agreements were in direct conflict, however, I find that the inference that Halma omitted any reference to the Cetani earnout

agreement in order to induce Mr. Rheault to sign the SPA is "at least as compelling" as the inference that Halma believed the earnout levels of sales under both agreements were achievable and that it was sufficiently likely that the earnout levels under both agreements would be reached that it was not necessary to call the existence of the Cetani earnout agreement to Mr. Rheault's attention.

### iii.    Reasonable Reliance

The defendants next argue that Mr. Rheault did not adequately plead the element of reasonable reliance and that certain terms in the SPA foreclose Mr. Rheault from claiming reasonable reliance on pre-agreement misrepresentations and material omissions.

**a.** In *AES Corp. v. Dow Chemical Co.*, the Third Circuit explained that in a section 10(b) securities fraud case, a plaintiff must show "a causal nexus between the misrepresentation and [the plaintiff's] injury, as well as a demonstration that [the plaintiff] exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests." 325 F.3d 174, 178 (3d Cir. 2003). As part of that inquiry, the court identified the following non-exclusive factors for determining whether the plaintiff's reliance on a misrepresentation or a material omission was reasonable under the circumstances: "(1) whether a fiduciary relationship existed between the parties; (2) whether the plaintiff had the opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of long standing business or personal relationships; and (5) the plaintiff's access to the relevant information." *Id.* at 178–79 (citing *Straub v. Vaisman & Co.*, 540 F.2d 591, 598 (3d Cir. 1976).

The defendants argue that all of those factors weigh against Mr. Rheault: They point out that there was no fiduciary relationship between Halma and Mr. Rheault; that Mr. Rheault is a sophisticated party who owned a multi-million-dollar company; that Mr. Rheault had a commercial

relationship with CenTrak; that Mr. Rheault had several months to conduct due diligence regarding the sale of Infinite Leap; and that information about the Cetani deal was publicly available.

Mr. Rheault responds that the only issue at this stage of the litigation is whether Halma omitted material information despite the statutory duty to disclose material information, and not whether public information was withheld or whether Mr. Rheault performed appropriate due diligence. Dkt. No. 18 at 7.

There is force to Mr. Rheault's contention that the plaintiff in a securities fraud case need not plead reasonable reliance at the motion to dismiss stage. In *AES Corp.*, the Third Circuit was reviewing a grant of summary judgment, not a motion to dismiss. 325 F.3d at 176. Moreover, the Third Circuit has explained that "[s]ince the failure to meet [the reasonable reliance standard] is in the nature of an affirmative defense, the burden of proof rests upon the defendant." *Straub*, 540 F.2d at 598. Courts in this district and others have reached the same conclusion on numerous occasions. *See Adams v. Klein*, No. 18-1330, 2021 WL 4439658, at *13 (D. Del. Sept. 28, 2021); *Cavi*, 2018 WL 2298353 at *4; *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 61 F. Supp. 3d 391, 396 (D. Del. 2014); *Tracinda Corp. v. DaimlerChrysler AG*, 364 F. Supp. 2d 362, 400 (D. Del. 2005); *In re DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 620 (D. Del. 2003); *see also Roll v. Singh*, No. 07-CV-04136, 2008 WL 3413863, at *11 (D.N.J. June 26, 2008) (finding it sufficient that the plaintiff alleged that he relied on the defendants' alleged misrepresentations and explaining it would be inappropriate to determine whether the plaintiff failed to perform due diligence at the motion to dismiss phase). Under that line of authority, the absence of reasonable reliance is a defense that must be raised by the defendants; it is not an element that must be pleaded by the plaintiff.

Even if Mr. Rheault was required to plead reasonable reliance, however, his complaint alleged that he reasonably relied on the defendants' misrepresentations and material omissions, and those allegations were sufficient to overcome the defendants' motion to dismiss on that issue. The complaint alleged that throughout the negotiations over the sale, including the negotiations over the earnout provision, Halma did not disclose the fact of the earnout component of the Cetani acquisition, Complaint ¶ 247, and that Halma "secretly intended not to perform or knew it could not perform" its contractual obligations pertaining to the earnout provision for Mr. Rheault, which "directly conflicted with the Cetani Earnout Agreement, rendering Rheault's Earnout impossible to achieve, *id.* ¶¶ 249, 251. The complaint further alleged that Mr. Rheault justifiably relied on the material omissions and would not have entered into the stock purchase agreement as written if he had known of the Cetani earnout agreement. *Id.* ¶¶ 252, 254. Those allegations are sufficient to avoid dismissal, even assuming that the complaint was required to plead reasonable reliance.

The defendants cite two decisions that address the issue of reasonable reliance at the motion to dismiss stage of the case, but those decisions involve facts quite different from those of the case at bar. In the first, *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, the court found an absence of reasonable reliance based on the allegations in the complaint itself. 499 F. Supp. 3d 49, 69–70 (D. Del. 2020). The plaintiff, SLF Holdings, alleged in the complaint that it had conducted its own due diligence to determine whether to accept the market risk of the defendants' stock as part of the payment it received from the defendant. *Id.* In part on that basis, the court concluded that the plaintiff "failed to allege that it did not have access to the relevant information and did not have ample opportunity to detect any purported fraud." *Id.* at 70.

In the second case, *Ajay Endeavors, Inc. v. Divvymed, LLC*, the court also relied on facts alleged in the complaint to determine that the plaintiff had an opportunity to detect the fraud and

thus that the plaintiff in effect pleaded itself out of court. No. 1:20-cv-01556, 2022 WL 605695, at *2 (D. Del. Jan. 10, 2022). In that case, the plaintiffs made an initial investment with the defendant, in which the defendant had misrepresented the payout provision in the contract. *Id.* at *1. The plaintiffs recognized the misrepresentation when the defendant asked for a second investment, yet they still entered into an agreement to make a second investment, which had the exact same issue in the contract terms. *Id.* The court concluded that because the plaintiffs had alleged that they "already noticed the same exact error in the first notes," they should have caught the mistake in the second notes, and they had a strong incentive to do so and did not allege they lacked the time to read the new notes. *Id.* at *2.

The present case is not analogous to the two on which the defendants rely, because the defendants' argument regarding reasonable reliance is not confined to the facts alleged in the complaint. In their briefing in support of the motion to dismiss, the defendants contend that the Cetani earnout agreement was publicly available. Dkt. No. 13 at 10. Because that assertion comes from outside the complaint, it would be improper to consider it at the motion to dismiss stage of the case. Moreover, while the defendants note that the complaint cites to a press release that contains a reference to CenTrak's purchase of Cetani, the press release does not include information about the earnout arrangement with Cetani, which was the information Mr. Rheault alleges Halma concealed from him. Complaint ¶ 55. There are no other facts alleged in the complaint that provide a basis for finding that Mr. Rheault failed to perform adequate due diligence regarding the transaction or was unreasonable in relying on the information he had about the Cetani transaction.

**b.** For their second argument on reasonable reliance, the defendants contend that the express terms of the SPA foreclose any claim by Mr. Rheault that he reasonably relied on any

misrepresentations or material omissions by Halma. Specifically, the defendants point to the combination of section 7.12 of the SPA (the integration clause of the agreement), and section 4.8 of the SPA (a disclaimer of representations or warranties by the buyer other than those expressly set forth in the agreement). *See* Dkt. No. 13 at 10–11 (citing Ex. A. §§ 4.8, 7.12).[1] Mr. Rheault responds that Delaware courts have previously interpreted similar integration clauses and have declined to enforce those clauses against claims of fraudulent inducement. Dkt. No. 18 at 9–11 (citing *Accelerant Twister, LLC v. Marjo, LLC*, No. CV 22-1366, 2023 WL 4457422, at *4 (D. Del. July 11, 2023)).

The court in *Accelerant Twister* explained that Delaware courts do not treat integration clauses as foreclosing reasonable reliance on statements outside the contract unless the clause in question is clearly an "anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." 2023 WL 4457422 at *3 (quoting *Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015)) (internal quotations omitted). The agreement at issue in *Accelerant Twister* contained an integration clause similar to the integration clause in the SPA, stating that the agreement at issue constituted "the sole and entire agreement" between the parties and superseded "all prior and contemporaneous understandings, agreements, representations and warranties, both

---

[1] Section 4.8 provides: "Except as expressly set forth in this agreement the buyer does not make and expressly disclaims any representation or warranty, whether express or implied, and, whether by common law, statute, or otherwise, regarding the buyer, buyer's acknowledgement set forth in section 4.7 above does not invalidate or otherwise disclaim any seller representations and/or warranties." Section 7.12 provides: "This Agreement and the other agreements referred to in this Agreement constitute the entire agreement and supersede all prior agreements and understandings, both written and oral, among or between any of the Parties with respect to the subject matter hereof and thereof, including without limitation that certain Mutual Non-Disclosure Agreement, dated September 30, 2020, between CenTrak, Inc. and the Company."

written and oral, with respect to the subject matter." That clause, the *Accelerant Twister* court held, did not qualify as an "anti-reliance clause." *Id.* Other Delaware cases are to the same effect. As the Delaware Chancery Court noted in *Kronenberg v. Katz*, 872 A.2d 568, 592 (Del. Ch. 2004), a standard integration clause such as section 7.12 of the SPA "does not operate as a bar to fraud claims, but rather simply to limit the scope of the parties' contractual obligations to those set forth in the written agreement." In order for a contract to bar a claim of fraudulent inducement, the court explained, "the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause. *Id.* at 593; *see also ABRY Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1058 (Del. Ch. 2006) (Because of "the law's traditional abhorrence of fraud . . . we have not given effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-contractual statements."); *FdG Logistics LLC v. A & R Logistics Holdings, Inc.*, 131 A.3d 842, 857–61 (Del. Ch. 2016); *Anvil Holding Corp. v. Iron Acquisition Co.*, C.A. No. 7975, 2013 WL 2249655 (Del. Ch. 2013).

Section 7.12 is a standard integration clause and, as such, does not qualify as an "anti-reliance" clause. Although section 4.8 of the SPA uses different language, it expresses the same idea as the integration clause, constituting the buyer's disclaimer of liability for any extra-contractual representation or warranty. Like section 7.12, that clause is not an anti-reliance clause because it does not state that the seller is agreeing that it will not rely on any statement or material omission outside the four corners of the contract as the basis for a claim of fraud. *See* Fridrikh V. Shrayber & Morgan J. Hanson, *Anti-Reliance Clauses and Other Contractual Fraud Limitations Under Delaware Law*, 25 Widener L. Rev. 23, 35–36 (2019).

The defendants point out that on occasion Delaware courts have read exclusive representation clauses and integration clauses together to find that they have the effect of an anti-

reliance clause.  *See Prairie Cap. III*, 132 A.3d at 51 (barring fraud claims because "Exclusive Representations Clause and the Integration Clause add up to a clear anti-reliance clause"); *Harland Clarke Holdings Corp. v. Milken*, No. 14-138, 2015 WL 12868204, at *3 (D. Del. Mar. 4, 2015). In *Prairie Capital*, the court considered an "exclusive representations" clause in which the buyer affirmatively acknowledged that it had conducted its own investigation of the seller's companies and that "the buyer understands, acknowledges, and agrees that all other representations and warranties of any kind or nature express or implied . . . are specifically disclaimed by the Double E parties."  132 A.3d at 50.  Focusing on the affirmative framing of that clause, the court found that the exclusive representations clause and integration clause together were sufficient to amount to an anti-reliance clause.  *Id.* at 50–51 ("If a party represents that it only relied on particular information, then that statement establishes the universe of information on which that party relied.").

In *Milken,* similarly, the plaintiff "acknowledge[d] that the representations and warranties" by the defendant "constitute[d] the sole and exclusive representations and warranties" of the defendant, and that all other representations and warranties relating to the condition of the purchased entities "are specifically disclaimed by the parties."  2015 WL 12868203, at *3.  The court treated that language as equivalent to an anti-reliance clause, and in light of that language, the court concluded that the plaintiffs "could not as a matter of law prove reasonable or justifiable reliance" on any extra-contractual representations by the defendant.  *Id*.

The clauses in the SPA most closely resemble the integration clause in *Accelerant Twister* and differ from the exclusive representations and integration clauses in *Prairie Capital* and *Milken*. The clauses at issue in this case, disclaiming all representations and warranties outside of the contract on behalf of Halma, did not constitute an affirmative disclaimer on the part of Mr. Rheault,

i.e., there was no promise by Mr. Rheault that he would not rely on any such extra-contractual promises.  The court in *Accelerant Twister* noted that Delaware courts have a long tradition of not allowing parties to contract out of fraudulent inducement claims and that standard integration clauses cannot relieve a party of its "oral and extra-contractual fraudulent representations" prior to contracting, in the absence of a clear anti-reliance undertaking by the party asserting fraud. *Accelerant Twister,* 2023 WL 4457422 at *3 (citing *ABRY Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1058–1059 (Del. Ch. 2006), and *Prairie Capital III*, 132 A.3d at 51).  That principle applies in this case because of the absence of an anti-reliance clause  in the SPA.

For that reason, I agree with Mr. Rheault that for purposes of this motion to dismiss, Mr. Rheault has not affirmatively represented that he is not relying on any extra-contractual representations.  Thus, the defendants have not shown that the language in the SPA creates, in effect, an "anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract."  *Accelerant Twister,* 2023 WL 4457422 at *3.

In sum, Mr. Rheault sufficiently pleaded the elements of his securities and common law fraud claims under the heightened pleading requirements of the PLSRA and Federal Rule of Civil Procedure 9(b).  Accordingly, the defendants' motion to dismiss is denied with respect to Counts I and II.

### B.  Breach of the SPA (Count III)

To state a claim for breach of contract under Delaware law, a plaintiff must allege (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting injury to the plaintiff.  *Sharma v. TriZetto Corp.*, No. 15-419, 2016 WL 1238709, at *3 (D. Del. Mar. 29, 2016).  In his complaint, Mr. Rheault alleged eight incidents of contract breach, including one

breach of SPA Section 6.3(a)(ii) (the indemnification provision) and seven breaches of SPA Section 1.8(d)(i) (the earnout period covenant) and Schedule 1.8 (the earnout schedule). Complaint ¶¶ 129–241.  For the following reasons, I find that Mr. Rheault has stated a claim for breach of SPA Section 1.8(d)(i) and Schedule 1.8. [2]

### 1.    Breach of Section 1.8(d)(i)

The defendants argue that Mr. Rheault failed to adequately plead a breach of Section 1.8(d)(i) because he did not allege any facts showing that Halma acted in bad faith or with the principal purpose of avoiding or reducing the earnout, as required by Section 1.8(d)(i). Dkt. No. 13 at 13.  Section 1.8(d)(i) states:

> "Buyer covenants and agrees that during the Earnout Period . . . [it] shall not, directly or indirectly, take any action, or cause or permit any action to be done in bad faith with the principal purpose of avoiding or reducing the amount of any Earnout Amount."

Dkt. No. 1. Ex. A § 1.8(d).  Mr. Rheault responds that he specifically alleged that Halma acted in bad faith by misrepresenting or omitting facts regarding the Cetani earnout agreement and by failing to make a good faith effort to sell Infinite Leap's products and services.  Dkt. No. 18 at 12 (citing Complaint ¶¶ 292–293).  He also argues that in paragraphs 134 through 241 of his complaint he laid out the numerous ways in which Halma breached its obligations under that provision of the contract.

Mr. Rheault has sufficiently pleaded a breach of Section 1.8(d)(i).  In addition to alleging that Halma failed to disclose the competing Cetani earnout agreement, Mr. Rheault specifically alleged the following:  (1) Halma sold and promoted a competing product (Cetani's software)

---

[2]  The parties in their briefing and the court in this opinion address the indemnification claim separately.

rather than Infinite Leap's product; (2) Halma failed to employ the number of salespeople for Infinite Leap products that the parties had agreed to; (3) Halma assigned the purported Infinite Leap salespeople primarily or entirely to non-Infinite Leap accounts; (4) Halma failed to train salespeople on Infinite Leap products; and (5) Halma failed to market or launch key Infinite Leap products, including Workflow, an asset management software, and Moblee, in a reasonable time period to achieve the earnout benchmarks.    Complaint ¶¶ 148–150, 156–200, 202–240. Additionally, Mr. Rheault alleged that CenTrak's CEO decided not to restructure Mr. Rheault's earnout after integrating Infinite Leap's software into CenTrak's platform, which made the contracted-for earnout impossible to achieve. *Id.* ¶¶ 126–128.  Taking all of those allegations as true, they give rise to a plausible inference that Halma acted in bad faith to avoid having to pay Mr. Rheault the earnout agreed to in the SPA. *See Iqbal*, 556 U.S. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

Halma also argues that the breach claims relating to Section 1.8(d)(i) should be dismissed because the defendant made commercially reasonable efforts to achieve the earnout.  Dkt. No. 13 at 14.  In support of that contention, Halma cites *Sharma*, 2016 WL 1238709, at *3, and *Tendyne Holdings, Inc. Securityholders' Representative Committee v. Abbott Vascular, Inc.*, No. 18-1070, 2019 WL 2717857, at *3 (D. Del. June 28, 2019), but neither case is instructive here.

In *Sharma*, the parties agreed to an earnout provision that prohibited the defendant from taking actions in bad faith to reduce the earnout payment to the plaintiff after the defendant acquired the defendant's company.  2016 WL 1238709 at *3.  The court in *Sharma* found the allegations in the complaint regarding the failure to market the business, changes to the management team, and the failure to invest resources into the business did not give rise to an

inference that the defendant had acted in bad faith, because under the agreement between the parties the defendant had been accorded "sole discretion" with regard to operating the acquired company. *Id.*

Similarly, in *Abbott Vascular*, the underlying contract regarding an earnout stated that the defendant had the right to "suspend, discontinue or decrease efforts to achieve the relevant Earn-out Event." 2019 WL 2717857 at *3. There are no similar provisions in the Infinite Leap SPA that vest Halma with sole discretion in operating the acquired company. In fact, the parties agreed to concrete provisions about the sales of Infinite Leap products, such as funding five salespeople to sell Infinite Leap products, and afforded Mr. Rheault the right of input regarding the hiring of those staff members. *See* Complaint ¶ 109.

## 2.    Breach of Schedule 1.8, Section 5

The defendants argue that Mr. Rheault failed to plead a breach of SPA Schedule 1.8, Section 5, because that provision says that CenTrak will supply the funding for no fewer than five full-time sales representatives, and Mr. Rheault alleged only that Halma did not employ five full-time salespeople. Dkt. No. 13 at 13–14. The provision in dispute reads as follows:

> CenTrak will provide funding for the Company to have no less than five (5) full-time dedicated Company sales representatives (two (2) dedicated to PH sales and three (3) dedicated to ES sales) during the Year 1 Earnout Period and Year 2 Earnout Period. Any new staff hired for these roles must be reasonably acceptable to the Seller.

Dkt. No. 1 Ex. D § 5.

The complaint's allegations on this issue are sufficient to avoid dismissal. Mr. Rheault made detailed allegations describing Halma's hiring of salespeople and the reassignment of Infinite Leap salespeople to non-Infinite Leap accounts. Complaint ¶¶ 156–193. Mr. Rheault also alleged that he repeatedly voiced concerns to CenTrak about the failure to hire five salespeople

and the assignment of Infinite Leap salespeople to non-Infinite Leap accounts.  *Id.* ¶¶ 195–196.

Taking those allegations as true, they support the plausible inference that the defendants failed to

comply with their obligations under Schedule 1.8, Section 5, and are liable for breach of that

provision of the agreement.

The defendants' response to Mr. Rheault's argument on this issue is that the provision of

the SPA in question states that CenTrak "will provide funding for no less than five full-time sales

representatives," and that Mr. Rheault has not alleged that CenTrak failed to provide that funding.

Dkt. No. 13 at 13–14.  That contention is wholly unpersuasive.  The implication of the defendants'

argument is that it would have been sufficient compliance with their obligations under the contract

to "provide funding" for five full-time sales representatives, even if they took no steps to fill those

positions.  Such a construction of the contract would be nonsensical and clearly contrary to the

intention of the parties in agreeing on such a clause, which was that there would be five full-time

employees devoted to promoting and selling Infinite Leap products.

### C.  Breach of the implied covenant of good faith and fair dealing (Count IV)

The defendants next argue that Mr. Rheault's claim for breach of the implied covenant of

good faith and fair dealing must be dismissed as duplicative of his breach of contract claim because

both counts are based on the same conduct.  Dkt. No. 13 at 15 (citing *Westway Holdings Corp. v.*

*Tate and Lyle PLC*, No. 08-841, 2009 WL 1370940, at *6 (D. Del. May 13, 2009)).

Mr. Rheault responds that under Delaware law "'[t]he implied covenant of good faith and

fair dealing inheres in every contract and requires a party in a contractual relationship to refrain

from arbitrary or unreasonable conduct which has the effect of preventing the other party to the

contract from receiving the fruits of the bargain."  Dkt. No. 18 at 13 (quoting *Mosiman v. Madison*

*Cos., LLC*, No. CV 17-1517-CFC, 2019 WL 203126, at *3 (D. Del. Jan. 15, 2019)).  "To state a

claim for breach of the implied covenant of good faith and fair dealing, a claimant must allege: (1) a specific implied contractual obligation; (2) a breach of that obligation; and (3) resulting damage." *Intermec IP Corp. v. TransCore, LP*, No. 20 C 3254, 2021 WL 3620435, at *11 (Del. Super. Ct. Aug. 16, 2021).

Mr. Rheault argues that he alleged each element of that cause of action because the parties agreed that Halma would not take any action to reduce or avoid the earnout, yet Halma engaged in unreasonable conduct to prevent Mr. Rheault from receiving the earnout.  Dkt. No. 18 at 15. Mr. Rheault also correctly notes that the defendants' citation to *Westway Holdings Corp.* is unhelpful to them because in that case the court was applying Illinois law under a choice of law provision, not Delaware law.

As the defendants point out in their reply brief, however, the cases Mr. Rheault cites state that a plaintiff "cannot assert a claim for breach of implied covenants of good faith and fair dealing that is based on exactly the same acts which are said to be in breach of express covenants." *Mosiman*, 2019 WL 203126 at *3 (citation omitted); *see also Intermec IP Corp.*, 2021 WL 3620435 at *20 ("an implied covenant claim will not survive a motion to dismiss if it, in fact, duplicates an express breach-of-contract claim" (internal quotations omitted)).  Mr. Rheault's implied covenant claim is based on the same conduct that underlies his breach claim, and he does not indicate any way in which the factual bases for the two claims differ.  For that reason, Mr. Rheault's claim for breach of the implied covenant of good faith and fair dealing must be dismissed as impermissibly duplicative of his breach claims.  *See Zinetti v. Deutsche Bank Nat'l Tr. Co.*, No. 19-1279, 2020 WL 409725, at *10 (D. Del. Dec. 6, 2022); *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, No. CV 2017-500, 2018 WL 2727542, at *9 (Del. Ch. June 6, 2018).

### D.  Contractual Indemnification (Count V)

The defendants argue that Mr. Rheault's claim that Halma breached section 6.3(a)(ii) of the SPA by failing to indemnify him for the loss of the $17 million earnout should be dismissed because Section 6.3(a) should not be read to cover "first-party damages," i.e., damages resulting from conduct by one of the parties to the contract.  Dkt. No. 19 at 19.  In support of that argument, the defendants cite *Travelers Indemnity Co. v. Dammann & Co.*, in which the Third Circuit explained that "the only sensible reading" of the indemnity clause at issue in that case was that it required "third-party liability exist for the clause to be triggered" even though the clause itself was not explicitly limited to third-party claims.  594 F.3d 238, 254–55 (3d Cir. 2010).  *Travelers Indemnity* is not controlling here, as it applied New Jersey law.  In any event, the *Travelers Indemnity* court stated that "we cannot hold that first-party indemnification claims . . . are categorically barred as a matter of law in New Jersey"; the court ruled only that under the circumstances in that case, the indemnification claim was fatally flawed, because "the only sensible reading of that clause evidences a requirement that third-party liability exist for the clause to be triggered."  594 F.3d at 255.

Mr. Rheault argues that the language of SPA Section 6.3(a) does not expressly limit itself to third-party claims and, in fact, the contractual language "distinguishes between indemnity owed to Rheault and indemnity for third-party Claims."  Dkt. No. 18 at 16. The provision states:

> Buyer [Halma] will indemnify and hold harmless the Seller Indemnitees [Rheault, and any Representative, Affiliate, heir, beneficiary, successor or assign of Rheault] from and against any and all Damages resulting from or arising out of:
>
> (i) the breach or inaccuracy of any representation or warranty of Buyer contained in ARTICLE IV of this Agreement;
>
> (ii) the breach or violation of any covenant or other obligation of Buyer under this Agreement; and

(iii) third-party Claims relating to or arising out of the operation of the Company from and after the Closing only to the extent that Seller is not obligated to indemnify any Buyer Indemnitee with respect to such Claims.

Ex. A § 6.3(a).

The plain language of section 6.3(a) is broad enough to encompass a first-party claim by Mr. Rheault against Halma for breach of the express contractual representations and warranties as well as other covenants and obligations under the contract. The separate reference to third-party claims in section 6.3(a)(iii) further supports Mr. Rheault's contention that first two subparts of section 6.3(a) are intended to include first-party claims.

Delaware courts have recognized that in some cases contracting parties have used indemnification clauses to govern remedial provisions between each other. *See Henkel Corp. v. Innovative Brands Holdings, LLC*, C.A. No. 3663, 2013 WL 396245 (Del. Ch. Jan. 31, 2013) (Section 10 of the Agreement, entitled 'Indemnification,' sets out the remedies available to each party in the event of breach."); *CertainTeed Corp. v. Celotex Corp.*, No., Civ. A. 471, 2005 WL 217032, at *1 (Del. Super. Ct. Jan 24, 2005) ("Under the asset purchase agreement, Celotex assumed the obligation to indemnify CertainTeed for certain losses CertainTeed might incur relating to the assets it was purchasing, and more generally, for losses incurred as a result of breach of the asset purchase agreement itself.").[3] The Indemnification clause in this case falls within that category of clauses and thus is not subject to dismissal.

---

[3] A number of Delaware cases have dealt with the question whether clauses providing for the indemnification of attorneys' fees apply to first-party claims. Delaware courts have typically found such clauses inapplicable to requests for fees arising from first-party disputes, but have instead limited the clauses to requests for fees incurred in defending against third-party claims. Those decisions typically have turned on two factors: (1) the conflict between such fee-shifting mechanisms and the "American Rule" requiring that parties normally pay their own attorneys' fees, and (2) provisions of the indemnification clauses that would be rendered nonsensical if they were applied to first-party fee disputes, such as provisions giving the indemnitor the authority to

The defendants further contend that an indemnification claim does not accrue "until the underlying claim is finally decided," and that Mr. Rheault's request for indemnification is therefore premature. Dkt. No. 13, at 19 (citing *Batty v. UCAR Int'l Inc.*, No. 2018-0376, 2019 WL 1489082, at *9 (Del. Ch. Apr. 3, 2019)). The *Batty* case, however, involved a claim for costs and attorneys' fees; in that context, the court explained that the right to an award of fees and costs does not accrue until the right to the fees is resolved, i.e., at the time the underlying claim is finally decided. Other claims, such as claims based on breaches of representations and warranties, accrue at the time of the breach. *See CertainTeed Corp.*, 2005 WL 217032 (different claims for indemnification accrue at different times).

Finally, the defendants argue, Dkt. No. 19, at 9, that if the court allows Mr. Rheault to pursue his first-party indemnification claims, his other claims must be dismissed because section 6.6 of the SPA, titled "Exclusive Remedy," provides that indemnification is the "sole and exclusive remedy for any claim or controversy arising out of or relating to this Agreement." The scope of the Exclusive Remedy clause may be the subject of briefing at a later stage of the case, but it would not be appropriate to enter a dismissal of all the claims other than the indemnification claim, as the defendants seem to want, based on a one-sentence argument in the defendants' reply brief.

The motion to dismiss Count V will be dismissed.

---

select the attorney for the indemnitee. *See, e.g.*, *Schneider Nat'l Carriers, Inc. v. Kuntz*, 2022 WL 1222738, at *29–30 (Del. Ch. Apr. 25, 2022) (citing numerous cases); *Int'l Rail Partners LLC v. Am. Rail Partners, LLC,* C.A. No. 2020-177, 2020 WL 6882105, at *4–5 (Del. Ch. Nov. 24, 2020); *DRR, L.L.C. v. Sears, Roebuck & Co*., 949 F. Supp. 1132, 1143 (D. Del. 1996); *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160, 1165 (Del. Super. Ct. 1978).

### E.  Unjust Enrichment (Count VI)

The defendants argue that Mr. Rheault's claim for unjust enrichment, brought against CenTrak, fails as a matter of law because the complaint did not plead the necessary relationship between CenTrak's enrichment and Mr. Rheault's impoverishment.[4]  Dkt. No. 13 at 15–16.  To survive a motion to dismiss, the defendants argue, Mr. Rheault has to have pleaded a direct relationship between CenTrak's enrichment and his impoverishment.  "[I]t is not enough that the defendant received a benefit from the activities of the plaintiff."  *Stein v. Wind Energy Holdings, Inc.*, No. N21C-09-06, 2022 WL 17590862, at *9 (Del. Super. Ct. Dec. 13, 2022).  The defendants characterize the benefits that CenTrak received from Infinite Leap as the lawful result of Halma's payment of $30 million for Infinite Leap stock.  Dkt. No. 13 at 16.  But Mr. Rheault's position is that CenTrak obtained for $30 million dollars benefits that were worth $17 million dollars more.  That $17 million dollars, according to Mr. Rheault, is the money he would have received from the defendants if Halma had made a good faith attempt to sell Infinite Leap's products and if the sales of those products had been sufficient to trigger the $17 million earnout payment the parties agreed to in the SPA.

Mr. Rheault contends that the unjust enrichment cause of action exists for just such a case as his: to allow recovery outside of a formal contract where one party has retained a benefit "to the loss of another . . . against the fundamental principles of justice or equity and good conscience."  *Fannin v. UMTH Land Dev., L.P.*, No. CV 12541-VCF, 2020 WL 4384230, at *26 (Del. Ch. July

---

[4] Unjust enrichment has the following elements: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law."  *Braintree Lab'ys, Inc. v. Schwarz Pharma, Inc.,* 568 F. Supp. 2d 487, 499 (D. Del. July 31, 2008).  The defendants challenge only the third element in their motion to dismiss.

31, 2020); Dkt. No. 18 at 17–18.  Mr. Rheault argues that his complaint establishes every element of unjust enrichment: CenTrak received the value of Infinite Leap's software, hardware, and services without having to pay Mr. Rheault the $17 million earnout payment that he contends he would have earned if the defendants had complied with their contractual obligations to continue marketing the Infinite Leap products.  *See* Complaint ¶¶ 304–310.

In the complaint, Mr. Rheault alleged that immediately after the sale, Infinite Leap's key engineers and one salesperson were placed in the new Prompt.Health division at Halma. Complaint ¶ 120.  He further alleged that Halma and CenTrak chose (1) to integrate Infinite Leap software and hardware into CenTrak's unified software platform to avoid competition between products and (2) to integrate the Prompt.Health team into the main CenTrak organization. Complaint ¶¶ 122–127.  Finally, he alleged that the integration resulted in all the gross margin generated from Infinite Leap's products and services being attributed to CenTrak and not contributing to hitting the benchmarks in the earnout agreement.  *Id*. ¶¶ 126–128, 306–310.  Taken together, these allegations are sufficient for pleading purposes to establish that the benefit to CenTrak was directly related to Mr. Rheault's loss of the earnout.

Under Delaware law, to prove unjust enrichment, "'there must be a showing that the defendant was unjustly enriched *by* the plaintiff who acted *for* the defendant's benefit.'"  *Stein*, 2022 WL 17590862 at *9 (quoting *Coretel Am., Inc. v. Oak Point Partners, LLC*, No. N21C-10-103, 2022 WL 2903104, at *11 (Del. Super. Ct. July 21, 2022)).  Although unjust enrichment cannot be used to "extend the obligations of a contract to [persons] who are not parties to the contract," *Stein*, 2022 WL 17590862, at *9, an unjust enrichment claim "may be brought against nonparties to a contract who knowingly facilitate and benefit from the breach."  *Coretel*, 2022 WL

2903104, at *11; *see also Rei Holdings, LLC v. LienClear - 0001*, No. CV 18-1401, 2020 WL 6544635, at *11 (D. Del. Nov. 6, 2020).

The allegations in the complaint are sufficient to show that CenTrak was unjustly enriched by Mr. Rheault, whose company's software and hardware was used for the benefit of CenTrak. While it is true that a portion of the benefits to CenTrak are attributable to the $30 million acquisition price Halma paid for Infinite Leap, Mr. Rheault sufficiently pleaded that some of the benefits to CenTrak are attributable to the defendants' post-acquisition actions that made it impossible for Mr. Rheault to achieve the benchmarks for his earnout. Mr. Rheault's allegations set forth a plausible claim that the defendants knowingly facilitated and benefited from the breach of the earnout covenant provision in Section 1.8(d)(i) of the contract. Count VI will therefore not be dismissed for failure to state a claim upon which relief can be granted.

### F.  Civil Conspiracy (Count VII)

In Count VII, Mr. Rheault alleged that Halma and CenTrak knowingly acted in concert to induce him to enter the purchase agreement and to avoid having to pay him the earnout funds. Complaint ¶¶ 314–315. The defendants argue that the complaint has not stated a complaint for civil conspiracy because (1) as a matter of law, a wholly owned subsidiary (CenTrak) cannot conspire with its owner corporation (Halma); (2) Mr. Rheault failed to plead a meeting of the minds on that subject between CenTrak and Halma; and (3) Mr. Rheault failed to plead an underlying wrong. Dkt. No. 13 at 17–19.

The defendants are correct that under Delaware law, a corporation cannot conspire with its wholly owned subsidiary, except in limited circumstances. *See E.I. du Pont de Nemours & Co. v. Agfa Corp.*, No. 17-CV-1577, 2019 WL 11624523, at *3 (D. Del. Apr. 15, 2019) (citing *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 893 n.74 (Del. Ch. 2009); *Am. Cap. Acquisition Partners,*

*LLC v. LPL Holdings, Inc.*, No. CIV.A. 8490, 2014 WL 354496, at \*12 (Del. Ch. Feb. 3, 2014)).
Mr. Rheault responds that the Delaware courts have not adopted a categorical rule, and that in
Delaware, a corporation can be found liable for conspiring with its wholly owned subsidiary under
certain circumstances.  Dkt. No. 18 at 18 (citing *Metro. Life Ins. Co. v. Tremont Grp. Holdings,
Inc.*, No. CIV.A. 7092, 2012 WL 6632681, at \*19 (Del. Ch. Dec. 20, 2012); *Allied Cap. Corp. v.
GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1037 (Del. Ch. 2006); and *Hospitalists of Del., LLC v.
Lutz*, No. 6221, 2012 WL 3679219, at \*11 n.67 (Del. Ch. Aug. 28, 2012)).  In particular, Mr.
Rheault argues that "[a] parent company and its subsidiary can be 'subjected to claims for
concerted action' when 'the parent and subsidiary share common economic interest[s],' as Rheault
ha alleged here."  Dkt. No. 18 at 18–19 (citing *Allied Cap. Corp.*, 910 A.2d at 1042).

In this case, the general rule applies, not the exception.  Mr. Rheault's characterization of
the exception as applying when the parent and subsidiary "share common economic interest" has
it backwards.  The Delaware courts have held that the general rule of no liability for conspiracy
applies in cases in which the parent and subsidiary share common economic  interests, while the
exception applies where they do not.  *See Fortis Advisors LLC v. Johnson & Johnson*, C.A. No.
2020-881, 2021 WL 5893997, at \*8 (Del. Ch. Dec. 13, 2021) ("There are exceptions to this general
principle [that a corporation generally cannot be deemed to have conspired with its wholly owned
subsidiary].  For example, the rule may not apply when a parent and its subsidiary do not 'share
common economic interests."); *Dow Chem. Co. v. Organik Kimya Holding A.S.*, C.A. No. 12090,
2017 WL 4711931, at \*12 (Del Ch. July 17, 2017) (same); *Hospitalists*, 2012 WL 3679219, at \*11
n.67 ("[A] controller can conspire with its affiliates or subsidiaries under Delaware law where it
does not 'share common economic interests' with the controlled entity.").

Delaware courts have also found an exception to the general rule that a corporation cannot be deemed to have conspired with its wholly owned subsidiary "when the officer or agent of the corporation steps out of her corporate rule and acts pursuant to personal motives." *Akande v. Transamerica Airlines, Inc.* No. Civ. A. 1039-N, 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006). In *American Capital Acquisition Partners,* the plaintiffs alleged that the defendants (a parent company, its wholly owned subsidiaries, and an officer of the wholly owned subsidiary) conspired to interfere with the plaintiff's prospective advantage under the Stock Purchase Agreement in which the defendant parent company acquired the plaintiff's company. 2014 WL 354496, at *11. The court concluded that the general rule applied because the defendants' injurious actions were not performed for reasons outside the normal course of their businesses. *Id.* at *12.[5]

Mr. Rheault's claim for civil conspiracy fails for the same reasons: He acknowledges that Halma and CenTrak share common economic interests, and he does not allege that the defendants took the relevant actions for personal reasons outside the normal course of business. Rather, his allegations suggest that Halma and CenTrak saw an advantage in acquiring Infinite Leap based on their previous work with Infinite Leap as an outside partner prior to the acquisition and then chose to integrate Infinite Leap into CenTrak's main software for business reasons. Complaint ¶¶ 85–88, 120–126. Regardless of whether their conduct was actionable under other theories of liability, it does not constitute a ground for a claim of civil conspiracy. Accordingly, the motion to dismiss Count VII will be granted.[6]

---

[5] The court in *American Capital Acquisition Partners* suggested that parties may be acting outside of the normal course of business (and, therefore, outside of the protection of the general rule) when an officer acts pursuant to personal motives rather than in her corporate role. *Id.*

[6] The defendants also argue that Mr. Rheault failed to plead two other elements of conspiracy (a meeting of the minds and an underlying wrong). Because the general rule that a

### G. Attorneys' Fees (Counts VIII and IX)

Mr. Rheault has included two counts directed at an award of attorneys' fees.  In Count VII he seeks attorneys' fees against Halma based on the indemnification provision of the SPA and Halma's alleged bad faith actions.  In Count IX, he seeks attorneys' fees against CenTrak based on CenTrak's alleged bad faith actions.  Complaint ¶¶ 321–334.  The defendants argue that those claims must be dismissed because (1) the SPA's "entire agreement" clause precludes Mr. Rheault from trying in effect to add a provision for attorneys' fees to the contract; (2) there is no independent claim for attorneys' fees under Federal Rule of Civil Procedure 54(d)(2); and (3) the claim against Halma based on the indemnification provision must fail on the same grounds that the defendants invoked in arguing that the indemnification claim must be dismissed.  Dkt. No. 13 at 20.  Mr. Rheault responds that the indemnification provision requires indemnification from "any and all Damages" and that the term damages is defined in the SPA to include reasonable attorneys' fees.  Dkt. No. 18 at 19 (citing Ex. A §§ 6.1(d), 6.3(a)(ii)).

The defendants are correct that any claim for attorneys' fees should be made by motion after this court enters a judgment.  Fed. R. Civ. P. 54(d)(2).  Thus, I grant the defendant's motion to dismiss as it applies to Counts VIII and IX.

### H. Amendment to the Complaint

In his answer to the defendants' Motion to Dismiss, Mr. Rheault requests leave to amend his complaint if the court finds that any of the counts in the complaint are insufficiently pleaded. As the defendants state in their reply brief, this "conclusory remark" is insufficient to support a request for leave to amend the complaint.  Dkt. No. 19 at 10 (citing *Ranke v. Sanofi-Synthelabo*

---

company cannot conspire with its wholly owned subsidiary applies in this instance, it is unnecessary to consider those other arguments regarding the conspiracy count.

*Inc.*, 436 F.3d 197, 206 (3d Cir. 2006); *Perlmutter v. Russell Hobbs, Inc.*, 450 F. App'x 161, 168 (3d Cir. 2011)).  Because Mr. Rheault did not indicate in what ways he would amend his complaint and did not attach a proposed amended pleading, as required in Local Rule 15.1, I deny Mr. Rheault's request for leave to amend his complaint as premature.

* * * * *

The defendants filed their opening and reply briefs in support of their motion to dismiss under seal.  Dkt. Nos. 13, 19.  Their redacted versions of those submissions removed all references to the price paid for Infinite Leap and the maximum agreed-upon amount of the earnout for Infinite Leap.  Dkt. Nos. 17, 20.  However, both amounts were referenced repeatedly in the complaint, which has been on the public record since this case was filed in June 2023.  For that reason, it would appear that no purpose would be served by redacting the public version of this Memorandum Opinion and Order.  However, I will give the defendants an opportunity, if they wish to avail themselves of it, to urge that this Memorandum and Order be redacted to remove the references to the price paid for Infinite Leap and the maximum agreed-upon amount of the earnout for Infinite Leap.  If they wish to make such an argument, they must do so by filing a letter within three days of the date of this order setting forth why the material in question should be redacted, notwithstanding that it is already on the public record.

## IV.    Conclusion

For the foregoing reasons, the defendants' Motion to Dismiss is GRANTED to Counts IV, VII, VIII, and IX, and DENIED as to Counts I, II, III, V, and VI.

37

IT IS SO ORDERED

SIGNED this 7th day of November, 2023.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE