UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARK RHEAULT,<br><br>               Plaintiff,<br><br>     v.<br><br>HALMA HOLDINGS INC. and CENTRAK,<br>INC.<br><br>               Defendants. | Case No. 1:23-cv-00700-WCB<br><br><br>**REDACTED PUBLIC VERSION** |

**OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
CERTAIN OPINIONS AND TESTIMONY OF PLAINTIFF'S DAMAGES EXPERT**

OF COUNSEL:

John T. Ruskusky
Nixon Peabody LLP
70 West Madison, Suite 5200
Chicago, IL 60602-4378
*Admitted pro hac vice*

Marissa A. Muscarella
Nixon Peabody LLP
275 Broadhollow Rd., Suite 300
Melville, NY 11747-4808
*Admitted pro hac vice*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
John P. DiTomo (#4850)
Rachel R. Tunney (#6946)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
jditomo@morrisnichols.com
rtunney@morrisnichols.com

*Attorneys for Defendants Halma Holdings Inc.
and CenTrak, Inc.*

May 12, 2025

**TABLE OF CONTENTS**

**Page**

I.  NATURE AND STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT ......... 1

II.  LEGAL STANDARDS ........................................................................................... 2

III.  ARGUMENT ....................................................................................................... 3

    A.  Mr. Cook Lacks The Qualifications To Opine On Liability or Legal Issues, Who Was A ▮▮▮▮▮ Or "Wrongful Conduct." ........................................................ 3

    B.  A Number Of Mr. Cook's Opinions Should Be Excluded For His Failure To Assess Or Identify Reliable Data. ............................................................................... 3

        1.  Mr. Cook Failed To Analyze Plaintiff's Speculative Projections ................................. 4

        2.  Mr. Cook failed to consider data on his claimed comparables and admitted that these products were not comparable. ................................................................ 6

    C.  Mr. Cook's Opinion Relating To Cetani Sales Should Be Excluded Due To His Lack of Analysis And His Admissions. ................................................................ 7

    D.  A Number Of Mr. Cook's Opinions Lack A Reliable Methodology ................................ 9

    E.  Mr. Cook's Opinions In Paragraphs 66 and 67 Should Be Excluded For Again Disregarding the SPA's Express Terms, And Along With Other Paragraphs, Should Be Excluded Because He Provides No Analysis ........................................................ 17

IV.  CONCLUSION ..................................................................................................... 20

<u>TABLE OF AUTHORITIES</u>

**Cases**                                                                        **Page**

*Allscripts Healthcare, LLC v. Andor Health*,
   LLC, 2022 WL 3021560 (D. Del. July 29, 2022)...................................................................3

*Benjamin v. Peter's Farm Condominium Owners Ass'n.*,
   820 F.2d 640 (3d Cir. 1987)...............................................................................................4

*Berckeley Inv. Grp. v. Colkitt*,
   455 F.3d 195 (3d Cir. 2006).................................................................................................3

*Braun Corp. v. Vantage Mobility Int'l, LLC*,
   2010 WL 5287484 (N.D. Ind. June 21, 2010) ..................................................................1, 6

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l*,
   350 F. Supp. 2d 582 (D. Del. 2004).....................................................................................4

*Crowley v. Chait*,
   322 F. Supp. 2d 530 (D.N.J. 2004) ....................................................................................13

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000)..................................................................................................2

*Enhabit, Inc. v. Nautic Partners IX, L.P.*,
   2024 WL 4929729 (Del. Ch. Dec. 2, 2024).........................................................................5

*Exelon Generation Acquisitions, LLC v. Deere & Company*,
   176 A.3d 1262 (Del. 2017) ............................................................................................12, 17

*Fundamental Innovation Sys. Int'l LLC v. Anker Innovations Ltd.*,
   2024 WL 2258127 (D. Del. May 17, 2024)......................................................................9, 15

*In re Paoli R.R. Yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994)....................................................................................................2

*In re TMI Litigation*,
   193 F.3d 613 (3d Cir. 1999)................................................................................................13

*Insight Equity v. Transitions Optical, Inc.*,
   252 F. Supp. 3d 382 (D. Del. 2017).....................................................................................2

*Kars 4 Kids, Inc. v. Am. Can!*,
   2019 WL 1755912 (D.N.J. Apr. 18, 2019) .....................................................................1, 16

*Legendary Art, LLC v. Godard*,
    2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) ...........................................................5

*M2M Sols. LLC v. Enfora, Inc.*,
    167 F. Supp. 3d 665 (D. Del. 2016)..........................................................................15

*Montgomery County v. Microvote Corp.*,
    320 F.3d 440 (3d Cir. 2003)........................................................................................5

*NetApp, Inc. v. Cinelli*,
    2023 WL 4925910 (Del. Ch. Aug. 2, 2023) ..............................................................6

*Obsidian Fin. Group, LLC v. Identity Theft Guard Solutions, Inc.*,
    2021 WL 1578201 (Del. Ch. Apr. 22, 2021) .....................................................11, 12

*Oddi v. Ford Motor Co.*,
    234 F.3d 136 (3d Cir. 2000)..........................................................................13, 14, 16

*Richie v. Hillstone Env. Partners, LLC*,
    2019 WL 2995178 (D. Del. Jul. 9, 2019) .................................................................18

*Ryanair DAC v. Booking Holdings, Inc.*,
    2024 WL 3732498 (D. Del. June 17, 2024).........................................................3, 18

*Stragent, LLC v. Volvo Car USA, LLC*,
    2024 WL 1366813 (D. Del. Apr. 1, 2024), *app. dismissed*, 2024 WL 4259487
    (Fed. Cir. Sept. 23, 2024)......................................................................................12, 20

*Thomson Reuters Enter. Ctr. GmbH v. Ross Intelligence Inc.*,
    751 F. Supp. 3d 381 (D. Del. 2024).................................................................. *passim*

*Wirtgen Am., Inc. v. Caterpillar, Inc.*,
    2024 WL 166833 (D. Del. Jan. 16, 2024).....................................................12, 14, 15

*Withrow v. Spears*,
    967 F. Supp. 2d 982 (D. Del. 2013).............................................................................2

*ZF Meritor LLC v. Eaton Corp.*,
    646 F. Supp. 2d 663 (D. Del. 2009)....................................................................7, 13, 14, 16

**Rules and Statutes**

Federal Rule of Evidence 702........................................................................2, 3, 18, 20

2

## I.    NATURE AND STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT

This case involves an earnout dispute brought by plaintiff Mark Rheault ("Plaintiff"), the former owner of a healthcare technology company called Infinite Leap ("IL"). On November 18, 2021, Plaintiff sold his company to defendant Halma Holdings Inc. ("Halma")[1] for ▮▮▮▮▮ pursuant to a Stock Purchase Agreement ("SPA").  Ex. 1.  The SPA provided for a contingent earnout of up to ▮▮▮▮▮ ("Earnout") based on the performance of Infinite Leap's Enterprise Services ("ES") (▮▮▮▮▮) and Prompt Health ("PH") ▮▮▮▮▮ business lines during the first two years post-closing (the "Earnout Periods").  *Id.*; *see* Ex. 2.

Plaintiff seeks to present Bryce Cook as a damages expert.  Ex. 3.  Mr. Cook seeks to opine that Plaintiff would have received the full Earnout Payment of ▮▮▮▮▮.  *Id.* ¶ 45.  Mr. Cook has testified multiple times for the Nelson Mullins firm in other matters and been paid over $500,000 dollars for such testimony (including this case).  Ex. 4 at 17-25, 64. For many of Mr. Cook's opinions in this case, he has failed to perform any analysis and instead relies solely on speculative projections and unreliable and unsupported assertions from Plaintiff.  *See Braun Corp. v. Vantage Mobility Int'l, LLC*, 2010 WL 5287484, at *7 (N.D. Ind. June 21, 2010), *report and recommendation adopted*, 2010 WL 5279974 (N.D. Ind. Dec. 17, 2010) (striking portions of Mr. Cook's report for using unreliable data that he failed to independently verify).  In other words, Plaintiff seeks to use Mr. Cook as a mouthpiece for Plaintiff's speculation and assertions.

Moreover, whether due to his blind reliance on Plaintiff's unsupported claims, his lack of analysis, or his lack of sales or development expertise, Mr. Cook's report also fails to apply a reliable methodology, including his "three approaches" to opine on damages, *Kars 4 Kids, Inc. v. Am. Can!*, 2019 WL 1755912, at *3 (D.N.J. Apr. 18, 2019) (granting motion to exclude Cook's

---

[1] Halma and defendant CenTrak, Inc. ("CenTrak") are collectively referred to herein as "Defendants."

1

testimony relating to hypothetical royalties and corrective advertising because neither opinion was based on a reliable methodology), which also veer into liability opinions (which also is not proper for a damages expert).  In his "three approaches" and multiple other opinions, Cook further ignores and/or contradicts the express terms of the SPA (and in at least one opinion contradicts himself).  Each of Mr. Cook's improper opinions should be excluded.

## II.   LEGAL STANDARDS

Federal Rule of Evidence 702 provides that an expert witness may testify if: "(a) the expert's . . . other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  The Court acts as a "gatekeeper to ensure that expert testimony is reliable and helpful." *Insight Equity v. Transitions Optical, Inc.*, 252 F. Supp. 3d 382, 385 (D. Del. 2017) (citation omitted).  "Rule 702 imposes three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).  For qualifications, the expert witness must have "specialized knowledge regarding the area of testimony." *Withrow v. Spears*, 967 F. Supp. 2d 982, 991–92 (D. Del. 2013).  For the reliability requirement, an expert's opinion must be based on reliable methods "rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his or her belief." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994).  The third requirement ("fit") "goes primarily to relevance," as the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and have "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Withrow*, 967 F. Supp. 2d at 992.  The proponent of expert testimony must establish the admissibility of the expert's opinion by a preponderance of the evidence. *Paoli*, 35 F.3d at 744.

III.     ARGUMENT

A.     **Mr. Cook Lacks The Qualifications To Opine On Liability or Legal Issues, Who Was A ▮▮▮▮▮▮▮, Or "Wrongful Conduct."**

Mr. Cook acknowledges that he is not an expert in sales or product development. Ex. 4 at 39. Nonetheless, he offers various opinions on who should be considered a ▮▮▮▮▮ (and why) and that Defendants' "Wrongful Conduct" relating to development or sales was responsible for Plaintiff not receiving his Earnout. *See, e.g.,* Ex. 3 ¶¶ 14, 18, 24, 31, 45. Mr. Cook's efforts to opine beyond his expertise should be excluded. Fed. R. Evid. 702; *see Ryanair DAC v. Booking Holdings, Inc.*, 2024 WL 3732498, *44-*45 (D. Del. June 17, 2024) (excluding expert opinions about whether defendants' actions caused result claimed because opinions were not based on expert's specialized knowledge). In doing so, his opinions also stray from damages to liability opinions, which is an independent ground for their exclusion. *See id.* at *44 (excluding expert from offering opinion that would be improper legal conclusion); *Berckeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 217-18 (3d Cir. 2006) (noting expert witness precluded from rendering a legal opinion); *Allscripts Healthcare, LLC v. Andor Health*, LLC, 2022 WL 3021560, at *22 (D. Del. July 29, 2022) (holding expert cannot opine as to legal cause of defendant's lost opportunities).

B.     **A Number Of Mr. Cook's Opinions Should Be Excluded For His Failure To Assess Or Identify Reliable Data.**

Much of Mr. Cook's report merely repeats various claims of Plaintiff, for which Mr. Cook performed no analysis or verification. There are at least two failures by Mr. Cook in that regard: (1) his failure to address Plaintiff's speculative pre-acquisition projections for PH and ES sales, which ignore IL's lack of development and sales (two of the products had no sales and a third product had minimal sales) and the absence of identified customers; and (2) his failure to analyze

3

whether CenTrak's sales of other long-time and known products were comparable to either PH products or ES services, bearing in mind IL's lack of historic PH sales and plateaued ES sales.

### 1.    Mr. Cook Failed To Analyze Plaintiff's Speculative Projections.

The PH Earnout required significant PH sales and associated gross margin to trigger much less maximize the Earnout.  The PH division was a start-up -- two of the three PH products had not been released and had no sales and no pipeline prior to acquisition, and the total 2021 revenue generated by the third PH product (WorkFlowRT) was ███████████████████████.  Ex. 3 at 81-83, 159-160.[2]  Mr. Cook ignores this actual revenue (or lack thereof) and status in his analysis. Ex. 5 at 28-29.  Instead, Mr. Cook relies upon Plaintiff's pre-acquisition projection in his report. *Id*.; Ex. 3 ¶ 65 ("Had Infinite Leap achieved [Plaintiff's] projection, it would have maximized the PH Earnout in both Years.").  Mr. Cook's circular "reasoning" provides no analysis, and he again failed to check the reliability of the underlying data.[3]  Mr. O'Donnell analyzed the document Mr. Cook relied upon and determined that nearly all of the projected PH sales and margins Mr. Cook calculates for both Earnout years were attributable to "unnamed accounts." Ex. 5 at 28-29 (citing Ex. 6); *see* Ex. 7 ¶ 4-6 (including tables).  In other words, Plaintiff's purported damages "evidence" consists of his speculation as to future sales to unknown customers for unreleased products. Plaintiff's projections cannot be considered reliable when 90% of Plaintiff's claim consists of sales to customers "to be determined."  *Benjamin v. Peter's Farm Condominium Owners Ass'n.*, 820 F.2d 640, 643 (3d Cir. 1987) (holding expert's opinion was too speculative because it solely relied on plaintiff's personal assessment of his capabilities); *Chemipal Ltd. v. Slim-Fast Nutritional*

---

[2] These undisputed facts are detailed in Defendants' Memorandum in Support of Partial Summary Judgment (the "Memo.") [Dkt 159] at 4-10, which are incorporated by reference to avoid repetition.
[3] Mr. Cook acknowledged the "difficulty in projecting sales of unreleased products," and thus, that he did not perform an actual or alternative calculation as a result.  Ex. 3 ¶ 59.  At his deposition, he further acknowledged that "we're not in a position to project sales of unreleased products." Ex. 4 at 257; *see id.* at 22-23 (noting his inability to make such projections in another case involving a start-up due to lack of data).

*Foods Int'l*, 350 F. Supp. 2d 582, 592 (D. Del. 2004) (excluding damages expert who used "untested, and unverified marketing projections [as] the foundation of a damages calculation").

It is even more striking when one looks at the next level of Plaintiff's projections. For his speculative PH projections, Mr. Cook relies upon Plaintiff's projections that 64% of the sales in 2021, and 84% of the sales in 2022, would be sales of *Moblee.* Ex. 5 at 29. As demonstrated in Defendants' Memo, Moblee was IL's first attempt to develop and commercialize a hardware project, had not been released or sold prior to the acquisition (November 18, 2021), ███████████████ ███████████████████████████████████████████████. *See* Dkt. No.159 at 4-10. Incredibly, Mr. Cook's analysis includes sales of the Moblee product as early as October 2021 – *before* the acquisition, and for sales that *did not occur.* Ex. 5 at 29.

Plaintiff's ES projections similarly are not reliable as they again rely on more than 54.4% of projected sales in Year 1, and 78.4% of projected sales in Year 2, ***to unnamed accounts that had not yet been identified***, Ex. 7 ¶ 6, despite sales that plateaued from 2017-2021. Ex. 4 at 141. All of Plaintiff's (and Mr. Cook's projections) are unreliable, and lacking any reliable data, his opinions as to potential sales throughout his report (¶¶ 31-51, 57-65, 66(c), and 68-71 and corresponding schedules and tables) should be excluded. *Legendary Art, LLC v. Godard*, 2012 WL 3550040, at *5 (E.D. Pa. Aug. 17, 2012) (finding expert's opinion would be excluded from the case because it relied on projections that were speculative and unreliable); *Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (affirming exclusion of expert testimony, on grounds that the data underlying his opinion was so unreliable that no reasonable expert could base an opinion on it); *Enhabit, Inc. v. Nautic Partners IX, L.P.*, 2024 WL 4929729, at *31 (Del. Ch. Dec. 2, 2024) (the court "cannot set damages based on speculation or conjecture," and no

reasonable basis to estimate compensatory damages exists where the claimed lost profits were "based on unreliable projections anticipating a future that never came to pass.").

Mr. Cook previously has been limited from offering opinions in similar circumstances. For instance, the court in *Braun Corp.* granted a motion to exclude Mr. Cook's testimony relating to a histogram on the grounds that it was not reliable because Mr. Cook had failed to independently verify the reliability of data used to create the histogram. 2010 WL 5287484, at *7. A similar limitation is called for here. *Thomson Reuters Enter. Ctr. GmbH v. Ross Intelligence Inc.*, 751 F. Supp. 3d 381, 390 (D. Del. 2024) ("Here, Dr. Ratliff essentially has no methodology for defining the relevant markets. He includes no math or economic modeling. He never analyzes potential competitors in any depth. All he does is make brief, conclusory assertions. That is not enough."); *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *23-24 (Del. Ch. Aug. 2, 2023) (rejecting damages based on pre-merger revenue projections which lacked "any tangible facts to support a reasonable inference that [plaintiff] would have achieved the theoretical synergies it projected," plaintiff's "predictions were aspirational," and contemporaneous documents suggested that plaintiff's personnel viewed the revenue projections as aggressive).

### 2. Mr. Cook failed to consider data on his claimed comparables and admitted that these products were not comparable.

An expert's opinion also is valid only if the assumptions on which it is based are reasonable and supported by evidence in the record. Mr. Cook's opinions at paragraphs 60-61 (and similar opinions in paragraphs 31-40) should be excluded for this additional independent reason.

In paragraph 60 of his report, Mr. Cook briefly references CenTrak's sales of other unnamed products to other unnamed customers but fails to reference what these other products are or how long they have been sold. Mr. Cook (after evading the question) could not provide basic details on what CenTrak's other sales involved. Ex. 4 at 168-169. He knew nothing about the

6

length of time that these unnamed products were sold, their name recognition from their preexisting sale, or the type of products. In other words, the extent of his investigation (and thus opinion) is that CenTrak has sold other unspecified products, and thus, CenTrak also could have sold the three PH products (one brand new with technical issues, and the other two which had not been released with no prior sales whatsoever). In further contradiction to his opinion, Mr. Cook also admitted that CenTrak's sale targeted the acute space (such as hospitals), while Plaintiff targeted a different space – clinics and non-acute space. *Id.* at 254.

For paragraph 61, Mr Cook could not even provide basic details such as how long Cetani had been sold and name recognition. *Id.* at 169-171. Notably, Cook again contradicted himself by then noting that Plaintiff's WorkFlowRT "targeted a space that Cetani had not penetrated and offered unique and superior capabilities to Cetani's software." Ex. 3 ¶ 61; Ex. 4 at 253-254. In other words, Cook seeks to rely on product that he (and Plaintiff) admit are different. These speculative opinions also lack support and should be excluded. *ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 667 (D. Del. 2009) (excluding expert opinion whose report relied on unreliable data that was unknown and untested by the expert).

Mr. Cook relies on the same unsupported assumptions in paragraphs 31-40 in which he tries to rely on CenTrak's sales of other unrelated products to create damages for Plaintiff. He lacks any reliable data to do so, and thus, all of these opinions should be excluded.

**C.      Mr. Cook's Opinion Relating To Cetani Sales Should Be Excluded Due To His Lack of Analysis And His Admissions.**

Mr. Cook, again based solely on Plaintiff's assumptions, opines that Cetani's earnout deprived IL of certain sales from November 18, 2021-March 31, 2022, and calculates damages of ▮▮▮▮▮ over the 4.5 month overlap period. Ex. 3 ¶¶ 68-70. Mr. Cook lists sales orders from December 2021-March 2022 that he contends could have been won by the recently released

7

WorkFlowRT (a total of ▇▇▇▇) or the yet to be released AssetsRT (a total of ▇▇▇▇). *Id.* Schedule 15. Mr. Cook fails to analyze three key facts for his opinion: (1) whether AssetsRT (which had never been sold by Plaintiff) was ready to be sold in the days and months shortly after the acquisition (and even if it was ready, any basis that this new product could be immediately marketed, sold and result in immediate revenue generally or considering the lengthy sales cycle); (2) whether Plaintiff's WorkFlowRT was competitive with Cetani's product; and (3) when the challenged sales actually took place.

Starting with (3), Mr. Cook credits *all* related revenue to IL, without considering whether those deals were won before the acquisition. In fact, all of these deals were won prior to the acquisition, including some for recurring yearly revenue on multi-year contracts dating back years. Ex. 8 ¶¶ 3-5. Because he performed no analysis, his report failed to identify a factual basis to credit Plaintiff for deals that were won prior to the acquisition. For instance, he included ▇▇▇▇ as damages relating to a customer, ▇▇▇▇, that purchased Activate in August 2021, months prior to the acquisition, despite admitting that he was not aware of anything that precluded Defendants from selling a Cetani product prior to acquisition, at a time when he acknowledges Defendants were not certain the acquisition would occur. Ex. 4 at 95-97. Mr. Cook further acknowledges that he did no investigation of whether the sales upon which he bases his calculation of damages included yearly payments based upon multi-year contracts entered into years pre-acquisition. *Id.* at 98-100; *id.* at 85 (agreeing Plaintiff should not receive credit for pre-acquisition sales).

Independent of this error, AssetsRT had never been sold and was not commercialized at the time of acquisition. Further, IL employees testified that it would be "years" before AssetsRT would reach the market. Dkt. 159 at 6-10. Simply put, there can be no damages from Cetani's alleged competition with AssetsRT in December 2021 to March 2022 because AssetsRT was not yet a

sellable product. *Id.* Mr. Cook fails to identify any basis that AssetsRT was ready, and even if it was on Day 1, that a new product on the market with no sales history would have captured any (much less all) of these sales generally or considering the lengthy sales cycle. *Id.*; *see* Ex. 4 at 129-130 (acknowledging that he had not seen any documents that AssetsRT was ready to be sold on day one); *see id.* at 81-85.

Third, for the two sales that Mr. Cook seeks to replace with WorkFlowRT, he also fails to address whether Cetani's product competed with IL's offerings. Even if one ignored that these sales occurred prior to the acquisition, Ex. 8 ¶¶ 3-5, Mr. Cook similarly ignores his own admission that Plaintiff's WorkFlowRT was different than the Cetani product line. In paragraph 61 of his report, he admits that WorkFlowRT "targeted a space that Cetani had not penetrated and offered unique and superior capabilities to Cetani's software." *See* Ex. 4 at 254 (admitting that Cetani and IL targeted different spaces). In his deposition, Mr. Cook admitted that he was making "factual assumptions" and not offering an expert opinion because he did not perform any independent assessment of how WorkFlowRT or other PH products compared to existing technology on the market. Ex. 4 at 252. Because he provided no analysis or comparable data, these opinions should be excluded. *Fundamental Innovation Sys. Int'l LLC v. Anker Innovations Ltd.*, 2024 WL 2258127, *5 (D. Del. May 17, 2024) (excluding opinion based on non-comparable licenses).

### D.    A Number Of Mr. Cook's Opinions Lack A Reliable Methodology

Separate from the fatal flaws demonstrated above, other portions of Mr. Cook's report suffer from a different flaw – a lack of a reliable methodology. His three approaches (Ex. 3 ¶¶ 31-44) evidence this lack of methodology, and moreover, fail to comply with the benchmarks set in the SPA. Mr. Cook acknowledges that these three approaches should be blended together, and like a three-legged stool, the failure of any of them causes Mr. Cook's approach to fail.

9

Mr. Cook's first approach assumes that "*any sales* made by ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ are a measure of what should be credited to the Earnout Calculation." Ex. 3 ¶ 32 (emphasis added).[4]  Mr. Cook limits this approach to ES – he does not apply it to PH[5]. *See id*. ¶ 33.  In this approach, Mr. Cook credits "*all revenue* from the purported "▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ estimating "the uncredited Year 1 Earnout Period revenue based on each ▮▮▮ ▮▮▮▮▮▮▮▮ average run rate in the Year 2 Earnout Period, reduced by 16% based on CenTrak's company-wide annual revenue growth in fiscal year 2023…." *Id*. ¶¶ 36 (emphasis added).

Critically, Mr. Cook cites no provision of the SPA that would support this approach, which seeks to credit to Plaintiff with anything sold by the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ regardless of whether such sales related to existing, long-time (*i.e.*, not "new") customers of CenTrak.  Contrary to Mr. Cook's approach, the SPA sets forth three very specific criteria for ES credit:



---

[4] Neither IL or CenTrak used the term "▮▮▮▮▮▮▮▮▮  Instead, employees had titles like sales director or sales engineer among others.  Regardless, Mr. Cook opines that a ▮▮▮▮▮▮▮▮ must be in a commissions database.  This opinion finds no support in the SPA (which makes no mention or requirement of commissions) and further ignores that two of the ▮▮▮▮▮▮▮▮ here received bonuses relating to sales activity rather than commissions. *See* Ex. 5 at 9, 57-58.

[5] Mr. Cook's exclusion of PH is intentional, because it undermines his approaches.  Plaintiff brought his lead salesperson to CenTrak, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ which further demonstrates the lack of reliable metholodgy for Mr. Cook's approaches.  The fact that CenTrak sold other products or services provides no foundation that the IL products or services were comparable or would be purchased by the same customer.  Mr. Cook identifies no actual much less reliable data to support his methodology.

Ex. 2 ¶ 2.  Mr. Cook's approach disregards these three contractual benchmarks that allow for payment under the Earnout and, instead, impermissibly bases his calculations in his first approach on an alternative, extra-contractual fourth criteria for which Plaintiff simply never bargained.[6]

Delaware law prohibits such efforts.  In *Obsidian Fin. Group, LLC v. Identity Theft Guard Solutions, Inc.*, 2021 WL 1578201, at \*5 (Del. Ch. Apr. 22, 2021), the Court dismissed a breach of contract claim premised on allegations that the defendants had failed to pay an earnout related to a 5.5-year government contract, even though the earnout provision unambiguously required that the earnout amount only be paid where such a contract endured for a 6-year period.  The Court first noted that the plaintiff did not "clearly articulate a legal basis by which the Court could sustain a breach of contract claim that plainly does not rest on the language of the contract."  *Id*.  The Court ultimately dismissed the claim, concluding that the plaintiff "has offered no sustainable basis to avoid the bargain it struck in clear contractual expressions of intent."  *Id*. at \*9.  In reaching this conclusion, the Court instructively opined that the plaintiff's attempt to avoid the express language of the earnout provision violated Delaware law and, indeed, the very purpose of the earnout:

> [A]n earnout provision contemplates the payout of additional, often substantial, consideration when the entity sold achieves specific, bargained-for milestones.  The value of the contingent consideration is inextricably linked to the estimated probability of the contingent event's occurrence.  To change the benchmark of the earnout would be to change its risk profile and, by extension, the amount that should be paid in the event of its achievement.  Under Delaware law, however, 'a party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table.'  Unlike horseshoes or hand grenades, there is no 'close enough' when it comes to earnouts negotiated by sophisticated parties based on the estimated probability that the *precise* measure would be hit.

---

[6] Contradicting his approach, Mr. Cook acknowledges that benchmarks are a key negotiated part of an earnout. Ex. 4 at 47-48 (further acknowledging that an earnout reflects a "disconnect between the perceived value of the buyer and the seller").

11

*Id*. at *8 (emphasis in original); *see, e.g., Exelon Generation Acquisitions, LLC v. Deere & Company*, 176 A.3d 1262, 1267-74 (Del. 2017) (reversing and granting summary judgment to buyer on earnout claim, where interpretation of contractual provisions demonstrated that condition which plaintiff claimed to trigger earnout payment was not one for which defendant contractually agreed to assume earnout obligation).

Here, the SPA is similarly clear, on its face, that Plaintiff did not bargain for ES-related earnout credit for merely "any sales" or "all revenue" of the ███████████████████████. Mr. Cook's contrary opinion, which fails to address much less account for the plain language of the SPA (*see* Cook Report ¶¶ 32-36), has zero basis in fact, is conclusory (including its failure to address whether these customers chose not to purchase Plaintiff's goods and services[7]), and must be excluded as unreliable and improperly based on entirely unsupported assumptions. *See, e.g., Thomson Reuters*, 751 F. Supp. 3d at 390 (expert's opinion excluded, where conclusory, not based on reliable methodology, and no analysis or explanation provided fitting facts of the case); *Wirtgen Am., Inc. v. Caterpillar, Inc.*, 2024 WL 166833, at *5 (D. Del. Jan. 16, 2024) (expert's opinion unreliable, where it failed to "outline a line of reasoning from a logical foundation" that supported its conclusion); *Stragent, LLC v. Volvo Car USA, LLC*, 2024 WL 1366813, at *1 (D. Del. Apr. 1, 2024), *app. dismissed*, 2024 WL 4259487 (Fed. Cir. Sept. 23, 2024) (summary judgment granted, where expert opinion excluded due to lack of analysis or factual basis).

Removing this one leg, the entire stool fails. Nonetheless, Mr. Cook's second approach suffers from additional errors. Under this approach, which again is limited to the ES portion of the Earnout, Mr. Cook seeks to create sales by assuming that an increase in the number of ████

---

[7] Mr. Cook also ignores Plaintiff's insistence shortly after the acquisition that ████████████████ should be able to obtain commissions from all products. Ex. 4 at 225-229 (referencing Deposition Ex. 80 (attached hereto as Ex. 9). Plaintiff cannot fault Defendants considering his own words and actions.

12

██████████████████████████ would result in a proportionate increase in credited gross margin.  As an initial matter, this approach is flawed, as it incorrectly assumes that there were not sufficient ES ██████████████ selling IL products.  Additionally, this approach again assumes that ES ██████████████ were only permitted to sell IL products, which contradicts the SPA[8] and Plaintiff's acknowledgement (Ex. 9) to CenTrak shortly after the acquisition.  Mr. Cook again merely assumes IL creditable revenue of this magnitude existed without any analysis or support. In fact, this approach, as with Mr. Cook's other approaches, fails to consider: that there was an approximate eighteen-month to two-year sales cycle for the products at issue including the  time required to develop new customers (Ex. 4 at 72:16-74:2); actual first year data related to ES sales and opportunities (*see* Ex. 5 at 20-28, 50); and the lack of a pipeline, as Plaintiff's former employees attest (much like Plaintiff's speculative projections of unnamed accounts) (*see* Dkt. 159 at 4-10; Ex. 7 ¶ 6).  In sum, Mr. Cook fails to provide sufficient analysis or data for his speculative approach.  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) (affirming exclusion of an expert that conducted no tests to test his hypothesis and used no methodology beyond his own intuition); *In re TMI Litigation*, 193 F.3d 613, 697–98 (3d Cir. 1999) (affirming exclusion of testimony for flawed methodology where expert relied on summaries prepared by a party's counsel rather than independently assessing and verifying); *ZF Meritor*, 646 F. Supp. 2d at 667 (excluding expert opinion whose report relied on unreliable data that was unknown and untested by the expert); *Crowley v. Chait*, 322 F. Supp. 2d 530, 546–47 (D.N.J. 2004) (excluding expert testimony where the expert relied on a summary of information prepared by counsel but failed to review the underlying information or conduct independent investigation).

---

[8] The ES table in Schedule 1.8 listed numerous products and services that could be sold.  Ex. 2.

Mr. Cook also intentionally excludes the PH division from this discussion, again because Ms. Henderson (the experienced ██████████ brought over by Plaintiff from IL), was unsuccessful in making any sales during her eight-month tenure. Factoring in this lack of sales success undercuts Mr. Cook's speculation that another ████████ could have made more sales. At his deposition, Mr. Cook first tried to avoid this reality and claimed that Ms. Henderson was not a ██████████████ because she did not make any creditable sales. Ex. 4 at 306. This contradicted his own report, in which Mr. Cook acknowledged that Ms. Henderson was a 100% ████████████████ during her entire tenure:

> Q. So your prior testimony about no sales equals no dedication, that was inaccurate, correct?
>
> A. That's correct . . . .

*See id.* at 323 (discussing Schedule 4 footnote 1 of Mr. Cook's report). In other words, Mr. Cook's second approach again is based on a flawed methodology that employs speculation while ignoring the actual data. Mr. Cook's approach also ignores that other CenTrak team members, in addition to the ES ██████████████, also made some of the ES sales. *See* Ex. 5 at 18, 57-61. For each of the independent reasons set forth herein, this methodology also should be stricken. *Oddi*, 234 F.3d at 158 (affirming exclusion of expert; expert's opinion must be based on reliable methods "rather than on subjective belief or unsupported speculation"); *ZF Meritor*, 646 F. Supp. 2d at 667 (excluding expert opinion whose report relied on unreliable data that was unknown and untested by the expert); *see Thomson Reuters*, 751 F. Supp. 3d at 390; *Wirtgen*, 2024 WL 166833, at *5.

Mr. Cook's third approach "calculates a gross margin *per* ████████████ using CenTrak's *company-wide sales data*." Ex. 3 ¶ 38 (emphases added). This approach uses "the *average actual sales per* ████████████ *as a proxy* for what a ████████████ ████████████ would have generated." *Id.* ¶ 39 (emphasis added). That is to say, Mr.

14

Cook bases this approach on data for all CenTrak sales —not just ███████████████████ and for sales of other goods and services entirely unrelated to ES or PH.

Mr. Cook offers no basis, whatsoever, to compare these other, unrelated sales of unrelated products by unrelated sales staff to ES-services (a newer niche service) or PH-specific product sales ██████████████████████████████████ and no sales for two other products that IL never released) made by █████████████████████, which is all that is pertinent to the claims at issue in this litigation. *See* Ex. 3 ¶¶ 38-39. Mr. Cook merely concludes that company-wide average sales serve as a "proxy" for ES and PH sales by ██████████████████, with no analysis or support attempted let alone provided. He admits that he did no analysis of what other products and services CenTrak was selling, including the length of time that these other unspecified products had been sold and their name recognition. Ex. 4 at 168-172. He also failed to consider any data relating to the sales cycle for these products (including the fact that new products can have longer cycles) and their lack of any pipeline. *Id.* at 72-75, 82-83. Simply put, Mr. Cook makes an assertion but fails to provide any analysis or support that these unrelated sales may be considered comparable to ES services or PH products. Mr. Cook's failure to provide any basis for his alleged comparison requires the exclusion of his unreliable methodology. *See Fundamental Innovation*, 2024 WL 2258127, at *4 (expert opinion excluded on grounds of reliance on non-comparable licenses); *M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 677 (D. Del. 2016) (same); *see also Thomson Reuters*, 751 F. Supp. 3d at 390; *Wirtgen*, 2024 WL 166833, at *5.

Mr. Cook's third approach also contradicts the actual data – for instance, Mr. Cook (and by proxy, Plaintiff) concedes that Kristan Henderson was a 100% ██████████████████ for PH. *See* Ex. 3, Schedule 4. Yet, it is beyond dispute that Ms. Henderson had absolutely no

15

creditable sales during her roughly eight months of work from November 2021 through June 2022 as an experienced, ███████████████████ for PH.  *See* Ex. 4 at 174:10-176:24.  Despite these facts, Mr. Cook opines (with no analysis) that other, less experienced ███████████████ would have surpassed her level of PH sales, and indeed, made millions of dollars in PH sales—which is an inherent assumption of his third approach, averaging all sales for all ████ ████████ CenTrak-wide.  *See id.* at 177:1-178:8, 186:1-187:5, 246:15-247:13, 289:4-290:20; 293:21-294:12; Ex. 3 ¶¶ 38-39.  Mr. Cook again fails to provide sufficient analysis or data for his speculative approach and ignores other facts discussed herein relating to the lack of product readiness and customer decisions relating to the PH division.   Mr. Cook offers zero basis for this mere speculation, mandating the exclusion of his unreliable opinion.  *Oddi*, 234 F.3d at 158 (affirming exclusion of expert; noting expert's opinion must be based on reliable methods and not subjective belief or unsupported speculation"); *ZF Meritor*, 646 F. Supp. 2d at 667 (excluding expert who relied on unreliable data that was unknown and untested by the expert); *see Thomson Reuters*, 751 F. Supp. 3d at 390.

The errors and speculative assumptions that Mr. Cook employed for the three Earnout payment calculations cannot be considered reliable methodologies.  The resulting average of these three calculations which Mr. Cook opined on as the economic damages also cannot be considered reliable.  Similar to a prior case in which certain of Mr. Cook's methodologies were stricken, his three approaches should be stricken here.  *Kars 4 Kids*, 2019 WL 1755912, at *3 ("Although the new figure was more precise, there is no methodology supporting how Cook arrived at this opinion. He merely concluded the amount of corrective advertising should be the total advertising spent by Kars 4 Kids. It is speculative to argue, without citation to authority, that the corrective advertising

for America Can! should equal the total advertising expenditures by Kars 4 Kids. Further, it is at best unclear how that figure would assist the trier of fact in rendering a decision.").

> **E.    Mr. Cook's Opinions In Paragraphs 66 and 67 Should Be Excluded For Again Disregarding the SPA's Express Terms, And Along With Other Paragraphs, Should Be Excluded Because He Provides No Analysis.**

In paragraphs 66(a)-(m) and 67 of his Report, Mr. Cook seeks to opine on what he calls "other errors, inconsistencies, and unsupported exclusions/adjustments."  These opinions should be excluded considering their lack of analysis and Mr. Cook's (and Plaintiff's) disregard of the express terms of the SPA.  *See, e.g., Exelon*, 176 A.3d at 1267-74 (rejecting earnout claim where contractual provisions demonstrated that condition which plaintiff claimed to trigger earnout payment was not one for which defendant contractually agreed to assume earnout obligation).[9]

First, Mr. Cook again ignores the terms of the SPA in paragraph 66(c), in which he seeks to serve as Plaintiff's mouthpiece for "failure to track upsells."  There is no contractual requirement to track upsells in the SPA.  *See* Ex. 1 ¶ 1.8, Ex. 2; Ex. 4 at 278-279.  In addition to the lack of any contract requirement, Mr. Cook again bases this opinion on "Mr. Rheault's position" and pre-acquisition projections, without providing any analysis on these projections, whether they are reasonable or not, and whether actual ES sales were "upsells."  Rather, he again seeks to serve as a cipher for Plaintiff's claims, with no analysis.  Ex. 4 at 278-284.

Second, the discussion in paragraphs 66(e)-(m) involves calculation disputes.  Mr. Cook again ignores the express terms of the SPA, which required Plaintiff to raise these calculation disputes within ██████████████████████████████████████████████████ and within ████████████████████████████████████████████████ and if he

---

[9] Plaintiff also did not disclose any of these claims in his Complaint or in his interrogatory responses, which will serve as a further basis to exclude these items at trial.

failed to do so, Defendants' calculations ███████████████████████████████████ Ex. 1 ¶ 1.8(a); *see id*. ¶ 1.8(b) (requiring submission of such disputes to ████████████ Plaintiff is bound by the express terms of the SPA and cannot raise these claims now in this proceeding. *See, e.g., Richie v. Hillstone Env. Partners, LLC*, 2019 WL 2995178, at *3 (D. Del. Jul. 9, 2019), *report and recommendation adopted*, 2019 WL 5110501, at *1 (D. Del. Aug. 26, 2019) (granting motion to dismiss complaint with prejudice, where "plaintiffs do not dispute the fact that they did not challenge the accuracy of the Earnout Statements within thirty days in accordance with § 2.7(b) of the APA"). Plaintiff received the First Year Earnout Statement in December 2022 and the Second Year Earnout Statement in December 2023, but he did not raise any of these calculation disputes within 60 days, as he agreed to do. These calculations are now binding, and Plaintiff is barred by the plain terms of the SPA from raising them here. Moreover, even if these untimely calculation disputes were allowed, Mr. Cook fails to identify any basis that he should be allowed to serve as mouthpiece for Plaintiff's untimely math claims. *Ryanair*, 2024 WL 3732498, *44 (excluding expert in part; noting that "[c]ourts in this district frequent reject exactly this type of 'calculation evidence' from experts").

Third, in paragraphs 66(a), (b) and (d), Mr. Cook also offers no damages opinion and admits that he has "not quantified" this claim (66(b)), and that he "had no ability to verify" his comments (66(d)). Considering his admissions and the lack of any opinion, these paragraphs provide no help to the trier of fact and should be excluded also. *Ryanair*, 2024 WL 3732498, *37 (excluding expert in part for opinions that do not satisfy the requirements of FRE 702 that "will help the trier of fact to understand the evidence or to determine a fact at issue").

Numerous other paragraphs in Mr. Cook's report suffer from the same deficiency. He notes that Plaintiff takes issue with some aspect of Defendants' acts, but ultimately, offers no

analysis or opinion on damages. Paragraphs 46-51 are one example. In a section titled "Failed to Track Infinite Leap's Services Revenue," Mr. Cook parrots various assertions of Plaintiff, again with no real analysis, and ultimately states that "[i]f Infinite Leap provided non-consulting services … we could not quantify the associated revenue and gross margins." Ex. 3 ¶ 51. In other words, he provides no damages opinion for Plaintiff's assertions, and thus, these paragraphs should be excluded because Mr. Cook's parroting of Plaintiff's complaints provide no help to the trier of fact. Paragraphs 57-65 (titled "Failed to Develop, Release, Market, and/or Sell PH Products) suffer from the same deficiency. Mr. Cook lists Plaintiff's various assertions, again with no real analysis, and states that "because of the difficulty in projecting sales of unreleased products," he did not perform a calculation that "directly measures the impact" of Plaintiff's assertion. *Id.* ¶ 59. Having failed to perform an analysis, acknowledging that any such analysis would be difficult because it covers "unreleased products [AssetsRT and Moblee]," Mr. Cook again provides no assistance to the trier of fact and should be excluded from testifying about these paragraphs and topics also.

Mr. Cook offers various other sound bites, with no real analysis, in other portions of his report, which also should be excluded. He makes two references to unjust enrichment that are relegated to footnotes, with no real analysis. Ex. 3 n. 24, 43. On the final page of his report, Mr. Cook provides a one-sentence bare opinion about a LOI with no analysis. Ex. 3 ¶ 71. At his deposition, Mr. Cook acknowledged his lack of investigation and analysis, including the fact that he was not aware that Plaintiff had no other interested bidders for IL, the fact that the SPA expressly confirmed that the Earnout could be $0, and the fact that the SPA contained a clear integration clause (which bars any claims based on the LOI). Ex. 4 at 131-135; Ex. 1 ¶¶ 1.8(c), 7.12 ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ These circular and

19

unsupported opinions also should be barred. *Stragent,* 2024 WL 1366813, at *1 ("A close examination of the expert's opinion reveals that she doesn't have a factual basis for her infringement opinion. Instead, she rolled out her proverbial Jump To Conclusions mat, made a logical leap, and then dressed it up as fact. She's not allowed to do that[.]").

## IV.    CONCLUSION

For the foregoing reasons, it is respectfully submitted that the expert opinion of Bryce Cook should be excluded under *Daubert* and Fed. R. Evid. 702 on the grounds that: (i) Mr. Cook lacks the expert qualification to opine on liability issues, as well as issues pertaining to who was a ▮▮▮▮ ▮▮▮▮▮▮▮▮▮ or what constituted "wrongful conduct;" (ii) his opinions fail to assess or identify reliable data; (iii) his opinions lack analysis and rely on mere speculation; (iv) his opinions lack a reliable methodology; and (v) his opinions disregard and contradict the express terms of the SPA.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ John P. DiTomo*

OF COUNSEL:

John T. Ruskusky
Nixon Peabody LLP
70 West Madison, Suite 5200
Chicago, IL 60602-4378
*Admitted pro hac vice*

Marissa A. Muscarella
Nixon Peabody LLP
275 Broadhollow Rd., Suite 300
Melville, NY 11747-4808
*Admitted pro hac vice*

John P. DiTomo (#4850)
Rachel R. Tunney (#6946)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
jditomo@morrisnichols.com
rtunney@morrisnichols.com

*Attorneys for Defendants Halma Holdings Inc.*
*and CenTrak, Inc.*

Dated: May 12, 2025

20
