## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MARK RHEAULT,                                    )
                                                 )
    *Plaintiff*,                            )
                                                 )
v.                                               )    Civil Action No. 23-700-WCB
                                                 )
HALMA HOLDINGS INC. and                          )    **FILED UNDER SEAL**
CENTRAK, INC.,                                   )
                                                 )
    *Defendants*.                           )

### MEMORANDUM OPINION AND ORDER

Plaintiff Mark Rheault brought this case against defendants Halma Holdings Inc. and CenTrak, Inc., alleging breach of contract among other claims. Mr. Rheault has moved for partial summary judgment that the defendants have breached their agreement with Mr. Rheault. Dkt. No. 151. That motion is denied. Mr. Rheault also moves to exclude various opinions of the defendants' expert under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Fed. R. Evid. 702. Dkt. No. 156. That motion is granted in part and denied in part.

The defendants have moved for partial summary judgment that certain of Mr. Rheault's claims must fail because he cannot prove that he suffered damages as to those claims. Dkt. No. 155. That motion is denied. The defendants have also moved to exclude various opinions of Mr. Rheault's expert under *Daubert* and Fed. R. Evid. 702. Dkt. No. 157. That motion is granted in part and denied in part.

## I.    BACKGROUND

In 2011, Mr. Rheault founded Infinite Leap, Inc., which provided software, hardware, and support services for the healthcare industry. Infinite Leap had two divisions: Prompt Health

1

("PH") and Enterprise Services ("ES").  In November 2021, Halma acquired Infinite Leap.  That acquisition was memorialized in a Stock Purchase Agreement ("SPA").  Dkt. No. 1-1, Exh. A ("SPA").  Following the acquisition, Infinite Leap became a part of CenTrak, which is a company owned by Halma.  In exchange for acquiring Infinite Leap, Halma agreed to pay Mr. Rheault a sum certain on the closing date and a second sum if certain conditions were met.  SPA at § 1.8; Dkt. No. 152, Exh. B ("Schedule 1.8").  The parties refer to the second sum as the "Earnout Payment."  Under the earnout provision in the SPA, which governs the potential Earnout Payment, Mr. Rheault was eligible to receive up to $8 million based on the success of Enterprise Services and up to $9 million based on the success of Prompt Health.  Schedule 1.8 at §§ 1(k), 1(g), 1(p), 1(t).  But Mr. Rheault would receive the Earnout Payment only if certain revenue thresholds were met.  *See, e.g.*, *id.* at Annex C (examples of calculating the Earnout Payment).

The SPA included provisions setting forth the conditions under which revenue from a sale would be counted toward the earnout threshold.  *Id.* at § 2.  Specifically, the SPA limits the revenue that can be considered for that purpose to (1) sales to preexisting Infinite Leap customers enumerated in Annex B to the SPA, (2) sales generated by dedicated Infinite Leap sales representatives to customers that are new to Infinite Leap and CenTrak after the date of the closing, and (3) sales of products or services that were developed by Infinite Leap and are incremental to CenTrak's products and services.  *Id.*

The SPA required Halma to "provide funding for the Company to have no less than five (5) full time dedicated Company sales representatives (two (2) dedicated to PH sales and three (3) dedicated to ES sales) during the Year 1 Earnout Period and Year 2 Earnout Period.  Any new staff hired for these roles must be reasonably acceptable to Seller."  *Id.* at § 5.

2

Mr. Rheault never received an Earnout Payment in any amount. He alleges that, but for the defendants' wrongful conduct, the thresholds for the Earnout Payment would have been met, and he would have been entitled to an Earnout Payment.

## II.   LEGAL STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine and material if a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On an issue as to which the moving party bears the burden of proof at trial, the party seeking summary judgment must "establish the absence of a genuine factual issue." *Resol. Tr. Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992). If the motion does not persuasively establish that no factual issue exists, summary judgment should be denied "even if no opposing evidentiary matter is presented." Id. Once the moving party with the burden of proof makes a showing that there is no genuine factual issue, that party is entitled to summary judgment "unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson*, 477 U.S. at 250.

For an issue on which the nonmoving party bears the burden of proof at trial, the party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c) as of 1986). The burden on the moving party in that situation can be satisfied

3

by "showing," that is, by "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. If the moving party carries its burden, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

The admissibility of expert testimony is governed by the Supreme Court's decision in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny. Under *Daubert* and Federal Rule of Evidence 702, the trial court is assigned the task of ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand. *Id*. at 597. In particular, the court must determine whether the reasoning or methodology underlying the expert's testimony is scientifically valid and whether that reasoning or methodology can properly be applied to the facts at issue. *Id*. at 593. The *Daubert* framework applies broadly to "scientific, technical, or other specialized knowledge," and the rules of evidence require the trial judge to determine "whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert*, 509 U.S. at 592).

## III.    DISCUSSION

### A.  Mr. Rheault's Summary Judgment Motion

**1.** Mr. Rheault has moved for summary judgment that the defendants breached the SPA. Dkt. No. 152. Mr. Rheault identifies four obligations that he argues the SPA imposed on the defendants. First, the defendants were required to provide sufficient funding to support at least five full-time dedicated sales representatives to sell Infinite Leap products following the defendants' acquisition of Infinite Leap. *Id.* at 6. Second, the defendants were required to employ those sales representatives (not simply to fund the positions). *Id.* Third, the defendants had an

4

obligation to maintain those sales representatives throughout the Earnout Period. *Id.* at 8. Finally, the defendants had an obligation to obtain approval from Mr. Rheault for any hires among the new sales representatives. *Id.* Mr. Rheault argues that the defendants breached those obligations by failing to maintain five full-time dedicated sales representatives for the required two-year Earnout Period. *Id.* at 10–11.

The defendants first respond by arguing that they were required only to provide funding for the five sales representatives, not necessarily to hire them. Dkt. No. 177 at 10. I previously rejected that argument. Dkt. No. 21 at 26. As I previously held, providing funding is not sufficient compliance with the requirements of the SPA if the defendants took no steps to fill those positions. *Id*. Therefore, the question is whether Mr. Rheault can prove that the defendants failed to take sufficient steps to maintain five full-time sales representatives dedicated to selling Infinite Leap products and services.

The defendants next raise the issue whether the sales representatives needed to be exclusively dedicated to selling Infinite Leap products and services. Dkt. No. 177 at 11. The defendants argue that it would be nonsensical for the parties to bar the sales representatives from selling anything other than Infinite Leap products and services. *Id*. at 12. In his briefing, Mr. Rheault responded that the modifier "full time" means that the sales representatives needed to be exclusively focused on Infinite Leap products and services—either from the Prompt Health division or the Enterprise Solutions division of Infinite Leap. Dkt. No. 182 at 3. At oral argument, however, Mr. Rheault's counsel conceded that a sales representative could occasionally make sales of other products but still be considered "full time dedicated" to the sale of Infinite Leap products. Nonetheless, there remain grounds for disagreement about the extent to which a sales representative would have to be committed to selling Infinite Leap products in order to satisfy the

5

requirement that the sales representative be a "full-time dedicated [Infinite Leap] sales representative," as provided in Schedule 1.8 at § 5 of the SPA.

As the parties' positions demonstrate, the meaning of the term "full time dedicated" is ambiguous. The term "dedicated" can mean devoted solely to a particular purpose, such that a full-time dedicated sales representative would be limited to exclusively selling Infinite Leap products. As the defendants note, however, it would be counter-intuitive to prohibit a CenTrak employee assigned to selling Infinite Leap products from making a sale of a non-Infinite Leap product in the event that a potential customer rejected the Infinite Leap product and instead requested a different, non-Infinite-Leap product sold by CenTrak. For that reason, both parties accept that representatives could be "full time dedicated" to the sale of Infinite Leap products and services, so long as the representatives were engaged full time in selling predominantly Infinite Leap products and services, even if the representatives were not strictly limited to those products and services. But the extent to which a sales representative could have responsibilities other than exclusively selling Infinite Leap products and services is left undefined in the SPA.

When a term in an agreement "is susceptible to two equally reasonable, but conflicting, interpretations, that gives rise to an unresolved issue of material fact that renders summary judgment inappropriate." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 784 (Del. 2012). That is the situation in this case. The jury will be permitted to hear evidence regarding whether and to what extent the parties intended to permit the sales representatives to sell non-Infinite Leap products and services, and it will be tasked with resolving that ambiguity. *See Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 n.60 (Del. 2019) ("When, in contrast, contractual texts are deemed ambiguous, the resolution of the ambiguity becomes a trial issue for the jury."). The jury will then be tasked with determining whether the

6

relevant individuals held full time dedicated roles, as the jury understands that term. The jury's resolution of that question will inform its determination of how many of the individuals who were involved in selling products after the acquisition can be considered full time dedicated sellers of Infinite Leap products within the meaning of the SPA.

There is very little overlap between the parties' positions as to which CenTrak employees were "full time dedicated sales representatives" within the meaning of Schedule 1.8 at § 5 of the SPA. The defendants contend that the sales representatives included Kendall Brown, Christopher Doran, Scott Hondros, Judith Rogers, and Kenny Woods, who were assigned to the ES Division, and Kristan Henderson, Lindsey Ellis, and Justin Pegram, who were assigned to the PH Division. Dkt. No. 177 at 10; *see* Dkt. No. 152-1, Exh. J at 92:23–94:3; Dkt. No. 178, Exh. 7 at 1. Mr. Rheault does not dispute that Ms. Brown, Mr. Doran, Mr. Hondros, Ms. Rogers, Mr. Wood, Ms. Ellis, and Mr. Pegram were involved with sales in some regard, but he contends that they "were never full-time dedicated Company [i.e., Infinite Leap] sales representatives." Dkt. No. 182 at 6–7.[1] As for Todd Stewart, Mikhail Baker, and Rudy Flores, whom the defendants identified as sales representatives, Mr. Rheault argues that they do not qualify as sales representatives within the meaning of the SPA because they were free to sell any products to any customer, and in any event they were belatedly designated as sales representatives, contrary to the requirements of the SPA. *Id.* at 7.

In addition to disagreeing about the meaning of the term "full time dedicated" in Schedule 1.8 at § 5, the parties advance differing interpretations of the term "sales representative," as that

---

[1] Mr. Rheault agrees that Kristan Henderson served as a "sales representative" within the meaning of the SPA, although she was employed in that capacity for only eight months during the first of the two earnout years. Dkt. No. 182 at 7. Her replacement, Jim Riley, served in that capacity for several months, but he left the company before the beginning of the second earnout year.

term is used in the SPA.  For example, Mr. Rheault argues that Mr. Pegram was denominated a "sales engineer," rather than a "sales representative."  Dkt. No. 152 at 12.  Mr. Rheault explains that sales engineers at CenTrak, unlike sales representatives, did not have quotas assigned to them nor did they earn commissions.  For that reason, Mr. Rheault contends that Mr. Pegram could not be counted as one of the five "sales representatives" for Infinite Leap products and services that CenTrak was contractually obligated to employ during the Earnout Period.  *Id.* at 7–8, 12.  Similarly, Mr. Rheault argues that Ms. Ellis was not a sales representative; instead, Mr. Rheault contends, Ms. Ellis was involved in downstream marketing and sales support, and she did not receive commissions for selling any products.  *Id.* at 12.  Thus, he concludes that Mr. Pegram and Ms. Ellis did not contribute to satisfying the minimum number of "sales representatives" that the defendants were required to employ under the SPA.  *Id.*

The defendants respond that the SPA does not require that sales representatives have quotas or earn commissions.  Dkt. No. 177 at 13 n.15.  The defendants also identify evidence that suggests that CenTrak did not have positions with the title of "sales representative."  *Id.* at 13 (citing Dkt. No. 178, Exh. 5 at 93:5–94:20).  Therefore, the defendants argue that whether an individual was a sales representative is a question of fact for the jury to resolve.  The defendants then identify record evidence that both Mr. Pegram and Ms. Ellis had sales responsibilities and played a role in the sale of one of the Prompt Health products, WorkFlowRT.  *Id.* (citing Dkt. No. 178, Exh. 17 at ¶ 8, and Exh. 18 at ¶ 9).  The defendants also explain that a sales engineer can be defined as an engineer who sells products and thus could be counted as one of the sales representatives required by the

SPA. *Id*. Based on that evidence, the defendants argue that the jury could reasonably find that Mr. Pegram and Ms. Ellis qualified as sales representatives under the SPA.[2] *Id.*

Because there is no definition of "sales representative" in the SPA, I find that the term could be understood restrictively, as Mr. Rheault suggests, to be limited to persons who receive commissions, have quotas, or are assigned specific customer accounts. But I also find that the term could be understood more broadly, as the defendants suggest, to refer to a person with direct sales responsibilities or who plays a significant role in sales. Accordingly, the jury will be permitted to hear evidence as to what the parties understood "sales representative" to mean and will be tasked with resolving that ambiguity. *See Sunline*, 206 A.3d at 846 n.60.

The parties' presentations raise similar factual disputes regarding other individuals who were involved in sales for CenTrak during the earnout period, including Infinite Leap products. For example, the defendants point to evidence suggesting that Mr. Hondros and Mr. Woods had sales responsibilities, played significant roles in sales efforts, had specific incentives tied to sales, and were engaged in selling Infinite Leap products. Dkt. No. 177 at 14 (citing Dkt. No. 178, Exh. 2 at ¶¶ 31–33 and Exh. F; *id.*, Exh. 3 at Exh. D). Moreover, the defendants contend that Mr. Rheault received earnout credit for their sales work. Dkt. No. 178, Exhs. 7 and 7B–C. The defendants also cite evidence that Ms. Brown, Mr. Doran, and Ms. Rogers were focused on selling Infinite Leap products. Dkt. No. 177 at 15 (citing Dkt. No 178, Exh. 5 at 122–23; Exh. 11 at 62:5–64:9; and Exh. 13 at 59:7–18); *see generally* Dkt. No. 178 at Exhs. 10–14. Mr. Rheault takes issue

---

[2] Mr. Rheault vaguely asserts in his reply brief that the defendants' recitation of the record evidence is "immaterial, inadmissible, or mischaracterized." Dkt. No. 182 at 8. He offers no explanation or analysis to support that assertion, so I find that undeveloped argument to be waived. *See Conroy v. Leone*, 316 F. App'x 140, 144 (3d Cir. 2009). Mr. Rheault can explain to the jury why it should reject the defendants' evidence as immaterial or mischaracterized, or he can object to it as inadmissible at trial.

with that evidence, contending that those individuals' involvement in the sale of Infinite Leap products was not sufficient to render them "full time dedicated sales representatives" for Infinite Leap products.

Given the factual nature of the disputes and the ambiguity in the SPA, those disputes are best suited for submission to a jury. *See Anderson*, 477 U.S. at 255 ("Neither do we suggest that . . . the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.").

**2.** In their response brief, the defendants further contend that Mr. Rheault's motion should be denied because in order to be entitled to recover under the SPA earnout provision, Mr. Rheault must establish that the defendants acted in bad faith, which is a showing he has failed to make. Dkt. No. 177 at 8 (citing SPA at § 1.8(d)(i)). Mr. Rheault responds that while the SPA contains a clause providing that bad faith by the defendants in applying the earnout provision would violate the contract, the SPA does not make bad faith a necessary predicate to establishing liability for breach of any of the other SPA terms. Dkt. No. 182 at 1–2.

I agree with Mr. Rheault. Section 1.8 of the SPA contains a list of covenants, one of which is a covenant not to act in bad faith with the purpose of avoiding or reducing CenTrak's responsibility to make an Earnout Payment to Mr. Rheault. SPA at § 1.8(d)(i). That provision bars the defendants from taking actions that do not otherwise constitute a breach of contract but nevertheless are intended to avoid or reduce the Earnout Payment. Separately, Schedule 1.8 contains a provision governing the defendants' obligations regarding sales representatives; that provision does not contain a "bad faith" requirement. Schedule 1.8 at § 5. Accordingly, the defendants could be liable for breaching the sales representative provision without being liable for breaching the "bad faith" covenant, or vice-versa. In short, Mr. Rheault can prove a breach of the

SPA without needing to prove bad faith on the defendants' part. For the foregoing reasons, I will deny Mr. Rheault's motion for summary judgment.

### B. The Defendants' Summary Judgment and *Daubert* Motions

The defendants have moved for summary judgment that Mr. Rheault is not entitled to recover any damages under the earnout provision as it relates to the Prompt Health line of products. Dkt. No. 159. The defendants have also moved to exclude the opinions of Mr. Rheault's damages expert, Bryce Cook. Dkt. No. 161. The defendants' motion for summary judgment is largely based on the argument that Mr. Cook's report contains "numerous errors, omissions, flawed assumptions, and [is] hopelessly speculative." Dkt. No. 159 at 13. Given the overlap between the defendants' summary judgment motion and their *Daubert* motion, I will address the two together.

**1.** As discussed above, Mr. Rheault has alleged that, but for the defendants' wrongful conduct, the revenue threshold necessary for triggering the Earnout Payment would have been met, and he would have been entitled to some amount of payment under the earnout provision of the SPA. Mr. Cook was hired to provide an opinion on what Earnout Payment Mr. Rheault would have received if the defendants had complied with the SPA.

In his report, Mr. Cook first offers his opinion that the defendants failed to comply with the SPA. Dkt. No. 162, Exh. 3 ("Cook Report") at ¶ 20. Specifically, Mr. Cook points to evidence from which he concluded that the defendants failed to provide five full-time sales representatives dedicated to the sale of Infinite Leap products. *Id.* at ¶¶ 21–31. The defendants argue that Mr. Cook lacks the qualifications to offer that opinion because it addresses liability rather than damages and offers a legal conclusion based on an interpretation of the SPA. Dkt. No. 161 at 3. I agree that in those portions of his report, Mr. Cook's opinion that certain individuals could not be considered full-time dedicated sales representatives improperly offers a legal conclusion, since his

opinions on that subject are directed to the meaning of that term as used in the SPA. *See In re Downey Fin. Corp.*, 593 F. App'x 123, 126 n.3 (3d Cir. 2015).

Additionally, in paragraph 21 and paragraphs 24 through 31 of his report, Mr. Cook simply weighs the evidence and states his opinion that the evidence of record supports a finding that the defendants failed to comply with the SPA. Mr. Cook is an accountant, and his expertise in accounting does not provide him with any special insight into the meaning of, or compliance with, the SPA. Therefore, Mr. Cook's assessment of the evidence bearing on the issue of the defendants' contractual compliance is not an appropriate opinion for an expert in accounting, a field having nothing to do with the legal construction of, or compliance with, a contract such as the SPA. The task of deciding whether the defendants breached their obligations under the SPA is for the jury, based on the evidence at trial.

By contrast, Mr. Cook's analysis of the commission data in paragraphs 22 and 23 of his report is not the product of an improper legal conclusion, although it feeds into his ultimate conclusion as to liability. Accordingly, Mr. Cook will be permitted to testify as to his analysis of the documents discussed in paragraphs 22 and 23 of his report, but he will not be permitted to state his legal conclusion, at paragraphs 24 to 31 of his report, as to whether certain individuals are full-time dedicated sales representatives, as that term is used in the SPA. *See Ryanair DAC v. Booking Holdings Inc.*, No. CV 20-1191, 2024 WL 3732498, at *44 (D. Del. June 17, 2024).

**2.** Mr. Cook offers three methods for calculating the additional revenue that would have been creditable toward the revenue threshold for the Earnout Payment if the defendants had employed five full-time dedicated sales representatives.

In his first method, Mr. Cook sums all the revenue generated by certain sales representatives that he says were not full-time dedicated to Infinite Leap products and credits all

that revenue toward the earnout threshold.  Cook Report at ¶¶ 32–36.  The defendants argue that Mr. Cook's approach is flawed because the SPA places limitations on what revenue can be credited toward the threshold, but Mr. Cook credits all the revenue generated by those employees, regardless of whether the revenue meets the SPA limitations.  Dkt. No. 161 at 10.  As noted, the relevant provision in the SPA defines the revenue that can be credited to (1) sales to certain preexisting Infinite Leap customers, (2) sales generated by dedicated Infinite Leap sales representatives to new customers after the date of the closing, and (3) sales of products or services that were developed by Infinite Leap and enhance the sales of CenTrak's products and services. Schedule 1.8 at § 2.  Mr. Rheault argues that Mr. Cook's approach is consistent with internal projections created by the defendants, and that his approach is reasonable, given that the SPA does not set forth a method to project revenue in the event of a breach.  Dkt. No. 174 at 16–17.

I agree with the defendants that Mr. Cook's first method of calculating the revenue that should have been credited to the earnout threshold impermissibly assumes that all the revenue generated by CenTrak sales representatives should be credited toward the threshold.  Instead, Mr. Cook needed to parse the revenue to determine which part of the revenue generated by those representatives satisfies the provision of the SPA governing credits to the threshold.  Mr. Rheault justifies Mr. Cook's calculations on the ground that they are consistent with the defendants' internal calculations.  But those documents, which are extrinsic to the SPA, do not override the plain language of the SPA.  And although the SPA does not set forth a methodology for calculating projected earnings in the event of a breach of the SPA, it contains limitations on the types of revenue that are creditable toward the earnout threshold, and Mr. Cook needed to consider those limitations when he did his but-for calculations.  Because Mr. Cook failed to do so, his first opinion, set forth in paragraphs 32 to 36 of his report, does not fit with the facts of the case and

will be excluded. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 755 n.12, 756 (3d Cir. 2000) (affirming the exclusion of an expert opinion that ignored the "real world" facts); *Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.*, 397 F. App'x 797, 800 (3d Cir. 2010) (affirming the exclusion of an expert opinion that ignored indisputable facts in reaching a conclusion).

In his second method for calculating the additional revenue that five full-time dedicated sales representatives would have generated, Mr. Cook divides the revenue that was credited toward the threshold by the defendants' "level of compliance" with the SPA, which he calculated in an earlier opinion. Cook Report at ¶ 37. The defendants argue that Mr. Cook's calculations were based on too many assumptions and failed to consider the facts of the case. Dkt. No. 161 at 12–13. Specifically, the defendants note that Mr. Cook did not consider the sales cycle, the actual sales data, and the lack of a customer pipeline for Infinite Leap's products. *Id.* Mr. Rheault responds that those facts are disputed, and that the defendants are impermissibly asking Mr. Cook to weigh the evidence in the defendants' favor. Dkt. No. 174 at 17–18. The problem with Mr. Cook's opinion, however, is not that he assumed the disputed facts would be resolved in Mr. Rheault's favor; the problem is that Mr. Cook simply assumed that if CenTrak increased the number of sales representatives, the revenue credited to the earnout account would increase proportionately. That assumption is nothing more than "subjective belief or unsupported speculation." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994). For that reason, Mr. Cook's opinion set forth in paragraph 37 of his report will be excluded.

For his third method of calculating the incremental revenue creditable to the earnout, Mr. Cook scaled up the revenue based on the CenTrak company-wide sales data instead of scaling up the revenue that he estimated the additional sales representatives would have generated, as he did in his second method. Cook Report at ¶¶ 38–41. The defendants argue that company-wide sales

14

include sales of products unrelated to Infinite Leap's products and made by sales representatives unrelated to the sales representatives assigned to the Infinite Leap products. Dkt. No. 161 at 15. Mr. Rheault responds by asserting that there is an overlap in product offerings across the company, so company-wide sales serve as a reasonable proxy for the sales of the Infinite Leap products. Dkt. No. 174 at 18–19.

That method, like the first method, does not adequately account for the fact that the SPA restricted which sales would be creditable toward the Earnout Payment threshold. It also does not account for the extent to which CenTrak's product portfolio overlaps with the Infinite Leap products and whether the sales of non-Infinite Leap products were comparable to the sales of Infinite Leap products. Mr. Cook's assertion to the contrary is based on impermissible speculation and unsupported assumptions, so his third method will be excluded. *Paoli*, 35 F.3d at 742.

Because each of Mr. Cook's three methods for calculating additional revenue will be excluded, his opinion regarding the average of the three methods will also be excluded. Cook Report at ¶¶ 42–44.

**3.** Mr. Cook next offers the opinion the defendants failed to track Infinite Leap's revenue adequately because they did not create new SKU numbers for the Infinite Leap products and services. *Id.* at ¶¶ 46–47. He also calculates how much time the professional services team spent on engagements for Infinite Leap clients as compared to engagements for non-Infinite Leap clients as a means of calculating the amount of revenue that was generated for CenTrak but not credited to Infinite Leap in the earnout calculation as a result of the failure to create new SKU numbers. *Id.* at ¶¶ 48–51.

The defendants object to that section of Mr. Cook's report on the ground that it does not offer an opinion on damages, but instead concludes that Mr. Cook "could not quantify the

associated revenue and gross margin." Dkt. No. 161 at 19.  Thus, the defendants argue that Mr. Cook's testimony on that issue would not help the jury.  I disagree.  His testimony explaining the role of SKU numbers and the problem created by a failure to use new SKU numbers—i.e., an inability to directly track certain revenue—may be helpful to the jury in determining whether the Earnout Payment threshold could have been met, even if Mr. Cook does not attach a specific damages number to the opinion.  The defendants do not otherwise challenge Mr. Cook's opinions set forth in paragraphs 46 to 51 of his report, so his testimony regarding those opinions will be allowed.

4.    Mr. Cook next offers the opinion that the defendants' failure to adequately develop, release, market, and sell Prompt Health products was one of the reasons Infinite Leap failed to reach the revenue threshold for the Earnout Payment.  Cook Report at ¶¶ 57–65.  That opinion is based on the sales data across CenTrak (paragraph 60), sales data from a competitor product sold by Cetani, which is an unrelated company owned by Halma (paragraph 61), a missing invoice record (paragraphs 62 and 63), and internal Infinite Leap projections (paragraph 64).  The defendants respond that Mr. Cook failed to determine whether the products sold by CenTrak and Cetani are comparable to the products sold by Infinite Leap.  Dkt. No. 161 at 6–7.  Mr. Rheault replies that Mr. Cook correctly observed that CenTrak and Cetani operate in the same market as Prompt Health.  Dkt. No. 174 at 13–14.  Mr. Rheault also explains that Mr. Cook did not testify that Prompt Health products would replace Cetani products—he just stated that the market was large enough to "encompass" the revenue needed to meet the earnout threshold.  *Id.* at 14.

The problem with Mr. Cook's testimony and Mr. Rheault's justification for that testimony is that both rest on speculation.  Mr. Cook offers no explanation for why the market for Cetani products would generate the revenue necessary to meet the earnout threshold, nor does he identify

any facts to support the conclusion that the various products even operate in the same market. To the contrary, Mr. Cook acknowledges that there is not perfect overlap in the market for the products at issue. *See* Cook Report at ¶ 61 (WorkFlowRT "targeted a space that Cetani had not penetrated . . ."). Therefore, there is too large a gap between the underlying data and his ultimate opinion regarding the CenTrak and Cetani sales data, so Mr. Cook's testimony based on paragraphs 60 and 61 of his report will be excluded. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000); *Wirtgen Am., Inc. v. Caterpillar, Inc.*, No. 117CV00770, 2024 WL 166833, at *5 (D. Del. Jan. 16, 2024).

Second, the defendants argue that Mr. Cook's opinions should be excluded because the internal Infinite Leap projections on which Mr. Cook relies are speculative. Dkt. No. 161 at 4. Specifically, the defendants take issue with the fact that Mr. Rheault's projections include sales to "unnamed accounts," and they characterize the projections as "speculation as to future sales to unknown customers for unreleased products." *Id.* Mr. Rheault responds that Mr. Cook's reliance on the projections is reasonable because (1) he also relied on the defendants' projections and (2) he factored in Mr. Rheault's experience and history of success. Dkt. No. 174 at 11.

The Third Circuit has held that "there is no *per se* rule of inclusion where an expert relies on a business plan; district courts must perform a case-by-case inquiry to determine whether the expert's reliance on the business plan in a given case is reasonable." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012). In the *ZF Meritor* case, the Third Circuit upheld the exclusion of expert testimony that relied on projections when the expert "was generally aware of the circumstances under which the [business projection] was created and the purposes for which it was used, [but] lacked critical information that would be necessary for [defendant] to effectively

cross-examine him." *Id.* at 293. Namely, the expert was not aware of the methodology that was used to create the projection or the assumptions on which it was based. *Id.*

In this case, the defendants have not shown that Mr. Cook is unaware of the methodology or assumptions underlying the projections, such that he could not be cross-examined on the purported flaws in the projections identified by the defendants. To the contrary, Mr. Cook's report indicates that he evaluated the projections and understands the inputs into the projections. *See* Cook Report at ¶ 64 ("These projections considered contracted revenue, known opportunities, and an estimate of unknown opportunities, all of which were broken down into revenue streams based on specific productions/solutions."). Moreover, Mr. Cook explained that he believes the projections are reliable given Mr. Rheault's experience and success in the industry. *Id.* Therefore, Mr. Cook's opinions are distinguishable from the opinions at issue in *ZF Meritor*. *See In re SemCrude L.P.*, 648 F. App'x 205, 214 (3d Cir. 2016); *see also Allscripts Healthcare, LLC v. Andor Health, LLC*, No. CV 21-704, 2022 WL 3021560, at *18 (D. Del. July 29, 2022). Accordingly, Mr. Cook's opinions based those projections will be admitted. The defendants will be free, of course, to challenge Mr. Cook's reliance on the projections through cross-examination before the jury. *See FinancialApps, LLC v. Envestnet, Inc.*, No. CV 19-1337, 2023 WL 6037242, at *4 (D. Del. Sept. 13, 2023).

**5.** Mr. Cook next offers an opinion in which he points to what he considers a series of flaws in the defendants' calculation of the Earnout Payment. Cook Report at ¶¶ 66–67. The defendants argue that Mr. Cook's testimony in paragraphs 66(a), (b), and (d) of his report should be excluded because those paragraphs contain no damages opinions. Dkt. No. 161 at 18. Those paragraphs, however, contain Mr. Cook's summary of the defendants' earnout calculations and the purported errors in that calculation. Mr. Cook's opinions regarding the purported flaws in the

defendants' calculations may assist the jury in understanding the defendants' earnout calculations and will be allowed.

The defendants next challenge Mr. Cook's opinion set forth in paragraph 66(c) of his report in which he alleges that the defendants improperly failed to track upsells by Infinite Leap's sales representatives to existing CenTrak customers.  Dkt. No. 161 at 17.  Mr. Cook asserts that a document prepared simultaneously with the final SPA specifically stated that the "upsells" were to be credited to the earnout threshold.  *See* Dkt. No. 174-1, Exhibit I, at 96–99 ("Schedule 1.8 Earnout Calculation: Augmented Legalese").  The defendants respond that there is no such requirement in the text of the SPA, and that it would be improper to allow Mr. Cook to engage in what would amount to a legal interpretation of the contract to find such a requirement in the SPA by implication.

The parties' presentations on this issue are quite cryptic, and neither party discussed this issue in the oral argument on the parties' summary judgment and *Daubert* motions.  Whether the document cited by Mr. Cook was intended to be a contemporaneous interpretation of Schedule 1.8 of the SPA was not made clear in Mr. Cook's report and was not discussed by the parties in their briefs.  Final resolution of this issue will therefore have to be postponed until trial.

The defendants also challenge Mr. Cook's opinions in paragraphs 66(e) through 66(m) of his report on the ground that those opinions ignore the provision of the SPA that required Mr. Rheault to challenge the defendants' earnout calculations within a certain period of time after receiving the calculations and that his failure to do so would render those calculations binding. Dkt. No. 161 at 18.  Mr. Rheault argues that he did not receive the earnout calculations until after he filed this lawsuit, so the defendants were on notice that he was challenging the calculations. Dkt. No. 174 at 19–20.  Whether the defendants were on notice that Mr. Rheault was challenging

19

the calculations within the relevant timeframe is a factual dispute for the jury to resolve, not a matter of contract interpretation. Testimony based on those portions of Mr. Cook's report will not be excluded.

6. Mr. Cook next offers an opinion regarding a separate earnout arrangement that Halma had with Cetani. His report states that Halma and Cetani entered into an earnout agreement that had a time frame that overlapped with Mr. Rheault's earnout agreement, and that Infinite Leap would have generated additional revenue but for the competing Cetani agreement. Cook Report at ¶¶ 68–70. The defendants argue that Mr. Cook failed to consider whether the Infinite Leap products at issue would have been ready to sell shortly after the acquisition, whether the products would have competed with Cetani's products, and whether the challenged sales of Cetani products occurred during the relevant period in which the competing Cetani products would have interfered with sales of Infinite Leap products. Dkt. No. 161 at 8. Mr. Rheault responds by asserting that the products at issue would compete with the Cetani products. Dkt. No. 174 at 14–15. For the reasons discussed above, that assertion lacks a factual basis and is contrary to other testimony from Mr. Cook. Mr. Rheault also responds that it was appropriate for Mr. Cook not to consider the date the Cetani sales were won because "some sales may have been 'won' before the overlap period, [but] there would be similar sales that were 'won' during the overlap period that were not invoiced until afterward." *Id.* That argument is based on pure speculation and does not provide a justification for Mr. Cook to ignore the date of the sales of the Cetani products. For those reasons, Mr. Cook's opinions regarding the Cetani earnout provision will be excluded. *Oddi*, 234 F.3d at 146.

7. Finally, the defendants argue that Mr. Cook's opinions regarding unjust enrichment and using Mr. Rheault's letter of intent as a basis for measuring expectation damages lack

20

sufficient analysis. Dkt. No. 161 at 19. Paragraph 25, footnote 24, of Mr. Cook's report provides a calculation for the salary of the missing sales representatives as a measure for unjust enrichment. Cook Report at ¶ 25 n.24. The defendants do not explain why that calculation lacks sufficient analysis, so that testimony will be allowed.

In paragraph 36, footnote 43, of Mr. Cook's report, he notes that the uncredited revenue could be a measure of unjust enrichment. *Id.* at ¶ 36 n.43. That opinion, however, is based on his first method for calculating the additional revenue that would have been generated had the terms of the SPA been observed, which I have excluded above. Mr. Cook's opinion in paragraph 36, footnote 43, of his report will therefore be excluded for being based on unsupported analysis.

Finally, Mr. Cook's opinion in paragraph 71 of his report states that Mr. Rheault's letter of intent establishes what Mr. Rheault expected to receive from the SPA. *Id.* ¶ 71. I agree with the defendants that Mr. Rheault's letter of intent contradicts the SPA, which contemplates that the Earnout Payment "could be zero." SPA at § 1.8(c). Accordingly, Mr. Cook's opinion based on the letter of intent will be excluded.

In sum, the opinions in the following paragraphs of Mr. Cook's report will be excluded: 21, 24–44, 60–61, 68–70, and 71.

**8.** In their motion for summary judgment, the defendants argue that Mr. Cook's damages theory regarding the Prompt Health products should be rejected because it is based on speculation, which is impermissible under Delaware damages law. Dkt. No. 159 at 11–13. The parties' first dispute concerns the correct legal standard. The defendants argue that Mr. Rheault must prove the fact of damages by reasonable certainty, although the amount of damages can be an estimate. Dkt. No. 185 at 1. Mr. Rheault argues that the defendants must prove that no reasonable factfinder could conclude that Mr. Rheault suffered any loss from the breach. Dkt. No. 176 at 5. The

defendants are correct about what Mr. Rheault must prove at trial: "[W]hen a contract is breached, expectation damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty.    The *amount* of damages can be an estimate."    *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015) (original emphasis).    But Mr. Rheault is correct that he does not need to prove his case to overcome summary judgment; rather, he need only show that there is sufficient evidence for a jury to return a verdict in his favor.    *Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).    For the reasons explained below, I find that Mr. Rheault has made such a showing.

The defendants' first argument is that damages based on unsupported projections are not recoverable.    Dkt. No. 159 at 11.    In support of that argument, the defendants cite the report of their damages expert, John O'Donnell, which they say demonstrates "numerous errors, omissions, flawed assumptions, and hopelessly speculative conclusions made in the profit projections."    *Id.* at 13.    The problem with that argument is that it relies on facts that are disputed.    As one example, the defendants challenge Mr. Rheault's inclusion of anticipated sales of a Prompt Health product named Moblee based on the defendants' assertion that Moblee was merely a proof-of-concept with no pre-acquisition sales, and that the project would need substantial additional development work before it could be commercialized.    *Id.* at 14.    Mr. Rheault, however, identifies record evidence that suggests otherwise.    That evidence includes a due diligence summary describing Moblee as "market ready," Dkt. No. 176, Exh. G, and a declaration asserting that Moblee was close to being finished at the time of the Infinite Leap acquisition, but that its further development was delayed by CenTrak, *id.*, Exh. B at ¶¶ 39–42.    Whether Moblee was sufficiently developed by the date of the projections such that it was reasonable to include it in the projected earnings for the Infinite Leap products is a question of fact for the jury to resolve.

22

Similarly, the defendants assert that AssetsRT, another Prompt Health product, was not commercially viable at the time of the Infinite Leap acquisition. Dkt. No. 159 at 15. But Mr. Rheault cites record evidence that AssetsRT was released in October 2021, a month before the SPA was signed. Dkt. No. 176, Exh. R. Again, whether AssetsRT was sufficiently developed by the date of the projections such that it was reasonable to include it in the projections is a question of fact for the jury to resolve.

As a second example, the defendants assert that the historical revenue for Infinite Leap's WorkFlowRT product was insufficient to make sales projections for that product. Dkt. No. 159 at 15. But the defendants acknowledge that WorkFlowRT had been on sale for 20 months, that it had five customers, and that there was a full year of sales data for the product. *Id.* Therefore, this case is unlike the cases cited by the defendants, in which courts rejected projections for products with no history of revenue. *See id.* at 12. As with the other products, whether 20 months of data is a sufficient basis for the projections Mr. Rheault offers is a question of fact for the jury to resolve. Because Mr. Rheault has shown there is a genuine factual dispute for trial, the defendants' motion will be denied as to that issue. *See Zenith*, 475 U.S. at 587.

The defendants' second challenge to Mr. Cook's analysis is that Mr. Cook relies on factual assumptions that are demonstrably false. Dkt. No. 159 at 16–18. The defendants' reasoning is largely duplicative of the arguments in their *Daubert* motion. For the reasons set forth above, the opinions of Mr. Cook that have been held to lack a factual basis will be excluded. His remaining opinions, which have a factual basis (albeit one the defendants challenge as inaccurate), can be the subject of cross-examination. *See Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 169 (D.N.J. 2008) ("Whether [the expert] should have more diligently researched the underlying facts given to him by Plaintiff, in the Court's view, is a question of

weight, not admissibility."). For example, the defendants' contention that it was unreasonable for Mr. Cook to assume that the sales cycle would be short, Dkt. No. 159 at 18–19, is best addressed on cross-examination in view of Mr. Rheault's evidence suggesting that the sales cycle could be as short as a month, *see* Dkt. No. 176, Exh. A at 79:7–80:5.

Given that Mr. Rheault has identified evidence showing that there is a genuine dispute as to whether he can prove his damages claim, the defendants are not entitled to summary judgment on the issue of damages.

### C. Mr. Rheault's *Daubert* Motion

Mr. Rheault has moved to exclude the opinions of Mr. O'Donnell, the defendants' damages expert. Dkt. No. 156. Mr. O'Donnell was hired to rebut Mr. Cook's opinions. As an initial matter, the exclusion of portions of Mr. Cook's report above renders pages 16–20, 51–52, and 55–64 of Mr. O'Donnell's report moot. *See* Dkt. No. 158, Exh. C ("O'Donnell Report"). Therefore, Mr. Rheault's only remaining challenge to Mr. O'Donnell's testimony is that the material at pages 12–13 and 29–50 of Mr. O'Donnell's report consists of a factual narrative rather than expert analysis. Dkt. No. 158 at 8.

Mr. Rheault argues that in those pages of his report, Mr. O'Donnell merely repeats and summarizes facts from the record. That testimony, Mr. Rheault asserts, is not helpful to the jury and therefore is inadmissible under Rule 702 of the Federal Rules of Evidence. *Id*. The defendants respond that Mr. O'Donnell's report "identif[ies] a critical methodological failure" in Mr. Cook's report, which is that Mr. Cook "did not undertake an independent review of the factual record in this case." Dkt. No. 173 at 8. The defendants conclude that Mr. O'Donnell's "discussion of the factual record is thus not improper narrative but, rather constitutes a necessary and appropriate critique of the foundation of [Mr.] Cook's expert opinions and a demonstration of why those

opinions should be excluded." *Id.* at 11.  Mr. Rheault replies that the defendants' opposition emphasizes the fact that Mr. O'Donnell's role is primarily to identify facts that Mr. Cook overlooked, which is not a task for which the defendants need an expert.  Dkt. No. 181 at 1.

"Rule 703 was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (citation omitted); *Ely v. Cabot Oil & Gas Corp.*, No. 3:09-CV-2284, 2016 WL 4169220, at *7 (M.D. Pa. Feb. 17, 2016) ("[An expert] may not offer testimony that is nothing more than a parroting of opinions of others, which he is not qualified on his own to give, and such testimony not only runs afoul of Rule 703, but also implicates Rule 403 because it is likely to confuse or mislead the jury.").

"While an expert must of course rely on facts or data in formulating an expert opinion, *see* Fed. R. Evid. 703, an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005).  I find that much of Mr. O'Donnell's testimony does not identify the facts on which his analysis relies; instead, it merely summarizes documents and paraphrases or quotes from declarations without offering any analysis of those materials.  Because "Rule 703 does not authorize admitting inadmissible evidence on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the inadmissible evidence other than transmitting it to the jury," it will be excluded.  *See Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1374 (Fed. Cir. 2021) (quoting 29 Charles Alan Wright, Arthur R. Miller & Victor J. Gold, Federal Practice and Procedure § 6274 (2d ed. 2020)) (cleaned up); *see also United States v. Tomasian*, 784 F.2d 782, 786 (7th Cir. 1986).

On pages 12–13 and 33–37 of his report, Mr. O'Donnell describes Mr. Rheault's involvement in the management of Infinite Leap after it was acquired by Halma. That testimony merely recites record evidence and parrots a declaration from one of CenTrak's employees. It does not contain any expert analysis. Accordingly, testimony based on those pages of Mr. O'Donnell's report will be excluded. *See Crowley v. Chait*, 322 F. Supp. 2d 530, 553 (D.N.J. 2004) ("an expert may not be used simply as a vehicle for the admission into evidence of otherwise inadmissible hearsay testimony").

On page 29 of his report, Mr. O'Donnell discusses his analysis of Mr. Rheault's projections and the facts that feed into that analysis. Because that discussion contains expert analysis, it will not be excluded.

On pages 30–32 of his report, Mr. O'Donnell describes the circumstances under which Mr. Rheault created the projections, including a discussion of conversations Mr. Rheault had with employees, the reactions certain employees had to the projections, and what Mr. Rheault did or did not know when he was creating the projections. That testimony merely parrots declarations and depositions transcripts of other witnesses and lacks any expert analysis. It will be excluded. *See Wi-LAN Inc. v. Sharp Elecs. Corp.*, 362 F. Supp. 3d 226, 233 (D. Del. 2019).

On page 38 of his report, Mr. O'Donnell identifies an error that Mr. Cook made with regard to the date on which Mr. Stewart began selling products and notes that Mr. Cook did not account for the time and effort it takes to integrate a company following an acquisition. That testimony identifies a flaw in Mr. Cook's analysis and will be allowed. Testimony relating to the statements on the remainder of that page of Mr. O'Donnell's report and testimony based on the statements made by Mr. O'Donnell on page 39 of his report simply summarize testimony from an employee, Marnie Lange Cossette, without any additional evidence or analysis and will be excluded.

On pages 40–41 of his report, Mr. O'Donnell summarizes customer reactions to WorkFlowRT and employee reports of those reactions. That testimony lacks any expert analysis and will be excluded. *See Highland*, 379 F. Supp. 2d at 469.

And finally, on pages 42–50 of his report Mr. O'Donnell summarizes the stage of the commercialization process reached by the Moblee product at the time of the acquisition of Infinite Leap. That testimony summarizes documents and declarations without offering any expert analysis and will be excluded. *See Wi-LAN*, 362 F. Supp. 3d at 233.[3]

\*    \*    \*

In an abundance of caution, this order has been filed under seal because the parties' briefs and exhibits regarding the present motions were filed under seal. Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal. Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 30th day of June, 2025.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

---

[3] Mr. Cook's report, like Mr. O'Donnell's, contains portions that consist largely of factual narrative rather than expert analysis. Those portions would also be subject to challenge, but those portions of Mr. Cook's report have already been excluded on other grounds, so it is unnecessary to determine whether they should be excluded on that ground as well.